# Thipsukon Arnold Rhodes

## v.

# Commonwealth of Virginia

Record No. 880399

September 22, 1989

Present: Carrico, C.J., Compton, Stephenson, Russell, Whiting, and Lacy, JJ., and Poff, Senior Justice

A. *Ellen White (Jester & Jester, P.C.*, on brief), for appellant.
*Eugene Murphy, Assistant Attorney General (Mary Sue Terry, Attorney General*, on brief), for appellee.

Senior Justice Poff delivered the opinion of the Court.

A jury convicted Mrs. Thipsukon Arnold Rhodes of first degree murder of her infant daughter, Kristie Lee Rhodes, as charged in the indictment. The Circuit Court of the City of Lynchburg en-

tered judgment confirming the verdict and imposing the sentence of 20 years in the penitentiary as fixed by the jury.

Assigning multiple errors, the defendant filed a petition for appeal in the Court of Appeals. By its order entered May 11, 1987, the Court of Appeals granted the appeal "limited to the consideration of the question whether the evidence supports a conviction of first degree murder." Upon consideration of briefs and oral argument addressed to that question, the Court of Appeals entered an order dated March 9, 1988 affirming the judgment of the trial court. The defendant then filed in this Court a petition for appeal from the several judgments entered below, and we granted the petition.

Because we find no merit in the defendant's challenges to evidentiary rulings made by the trial court, we review all the evidence admitted at trial, and we do so in the light most favorable to the Commonwealth. Responding to an emergency telephone call, placed by the defendant at 11:30 p.m. on January 7, 1986, the Lynchburg Rescue Squad found the defendant's youngest daughter, Kristie, age 3 months, "totally unconscious". Although she still had a pulse, her respiratory rate was only "four or five times a minute". While the paramedics were treating the infant, Mrs. Rhodes was "crying". Dr. Dan Mason, a volunteer member of the rescue squad, said that Mrs. Rhodes "appeared to be hysterical enough to the point that [he] could not ascertain exactly what had happened to the child."

The infant was intubated, and breathing was maintained by use of "a bag mask". The baby and her mother were taken to Lynchburg General Hospital where the results of a "CAT scan" and protrusion of the fontanel, the soft spot on the infant's head, indicated "blood in the area between the skull and the brain" and "signs of brain swelling".

At 2:30 a.m. the following morning, Kristie was transported by helicopter to the University of Virginia Medical Center. There, Dr. Thomas A. Massero, finding that Kristie "had severe neurological depression" and "no spontaneous respiration", placed the child on "full mechanical ventilation". Further examination disclosed "bruises on both of her buttocks" and on her forehead; "a hematoma, a collection of blood in the back . . . of her head"; "a fairly significant skull fracture" located near the hematoma; "retinal hemorrhages . . . diagnostic of severe shaking and trauma to the head"; and a healing fracture of the left leg. Doctor Massero

described Mrs. Rhodes as "very distraught to almost hysterical at times" and as "fainting or becoming hypertensive twice". In the opinion of Dr. Frank T. Saulsbury, a pediatrician who also examined Kristie at the hospital, this was "a classic example of child abuse, unfortunately fatal child abuse."

Kristie was diagnosed as brain dead and mechanical ventilation was discontinued at 12:30 p.m. on January 9, 1986. Dr. Marcella Fierro, a medical examiner, performed an autopsy. Because the trial court had overruled the defendant's pre-trial motion to exclude reference to prior injuries, Dr. Fierro was permitted to testify that a bruise behind Kristie's left ear was more than three days old and that the leg fracture was at least two weeks old. The medical examiner's testimony confirmed the findings of other doctors concerning external injuries. Over defense objections, photographs taken during the autopsy were admitted into evidence, and Dr. Fierro was permitted to use them to illustrate her testimony describing injuries revealed by internal examination.

Subsurface evidence of the depth of hemorrhaging showed that the bruises to the buttocks were caused by "moderate to severe force" administered with "a large impacting surface." Beneath scalp bruises, invisible on the surface, were four or five fractures of the skull. These injuries were inflicted by a "blunt impact, something hard, the skull impacting with a hard surface, a more or less broad surface so that there is no laceration". Dr. Fierro concluded that the cause of death was brain damage resulting from skull injuries sustained "probably an hour or less from the time she went to the hospital."

The police questioned the defendant on January 8, 10, and 13. Although the second interview was conducted in a police car parked at the defendant's residence and the third at the police station, the evidence shows that the defendant was always free to leave and that she remained at liberty until the capias for her arrest was issued on February 3. The defendant moved to suppress evidence of her statements on the ground the police had failed to give her *Miranda* warnings. Finding that the defendant was not in custody at the time the interviews were conducted, the trial court overruled the motion.

As defense counsel conceded, aside from Mrs. Rhodes' acknowledgement that she was the only adult present at the time, when, according to, Dr. Fierro, the fatal injuries had been inflicted, nothing the defendant said during the three interviews was incul-

patory. Mrs. Rhodes told the police that her husband had left for work on the night shift at 6:30 p.m., leaving her at home with Kristie and Crystal, her firstborn child, then 14 months of age. At 8:30 p.m., Mrs. Rhodes fed Kristie, the child fell asleep at 9:00 p.m., and Mrs. Rhodes and Crystal went to bed. At 11:00 p.m., Mrs. Rhodes heard a noise in Kristie's room and went to investigate. She found the child "choking and she spit up some milk and turning her head around like she couldn't breathe."*

Mrs. Rhodes said that she placed Kristie on the couch in the living room and attempted to "give her mouth-to-mouth". When the child failed to respond, the defendant "got excited and kind of slap her on the leg, on her right thigh here with this hand and she got some bruises where I hit her". Mrs. Rhodes then began to "shake her trying to get her to come around and she wouldn't." At that point, she placed a call to the rescue squad.

A social worker who talked with Mrs. Rhodes twice following the tragedy testified that she had said that she had left Kristie lying on the couch in the living room about 8:00 p.m. while she prepared the baby's bottle. Hearing "a thump", she returned to the living room where she "found the baby lying on the floor on its back, and found the older child looking over it. She said the older child had a toy . . . and was sort of pushing the [toy] on the child." The witness said that Mrs. Rhodes "thought . . . the oldest child had been wanting to play with her younger child and may have pulled her off the couch." When Mrs. Rhodes picked up the baby, she "noticed a little red spot" but no blood, and when the child stopped crying, she fed it "four or five ounces" of milk. The witness had heard Mrs. Rhodes testify in the Juvenile and Domestic Relations Court proceeding, and she said that her testimony then was "[b]asically the same". Mrs. Rhodes' testimony at trial was the same in all material particulars.

On her second visit with the defendant, the social worker had measured the height of the couch and found it to be "seventeen and one-half inches from the top of the couch to the hardwood floor". Dr. Saulsbury gave the following answer to the following question:

---

* Kristie, born prematurely in October and sustained on a ventilator for the first day of her life, had experienced difficulty in breathing in December, and Mrs. Rhodes had taken her to the hospital emergency room.

Q. . . . If the mother were to have stated this child rolled off a couch that was 17 inches high on to an uncarpeted floor, would that explanation have been consistent with the injuries you saw on Christie that day?

A. Absolutely not.

Asked a similar question, Dr. Fierro said that the large fracture on the top of Kristie's skull discovered during the autopsy could have occurred only if the victim had been "pushed into a wall very hard" or "dropped on [her] head from a significant height" which she characterized as a distance of "[s]everal feet at least". Dr. Fierro also opined that Kristie's fourteen-month-old sister could not have caused Kristie's injuries with the toy as Mrs. Rhodes suggested.

For the reasons stated in the order entered May 11, 1987, we agree with the holdings of the Court of Appeals that the trial court did not err in admitting into evidence the statements Mrs. Rhodes made to the police, the testimony concerning prior injuries sustained by the infant, or the photographs depicting those injuries. We consider now whether the evidence was sufficient to establish the grade of offense of which the defendant was convicted.

We begin our analysis by reviewing familiar principles of law. Insofar as relevant here, Code § 18.2-32 provides that "[m]urder . . . by any willful, deliberate, and premeditated killing . . . is murder of the first degree . . . . All murder other than capital murder and murder in the first degree . . . is murder of the second degree . . . ." Malice, an essential element of all grades of murder, distinguishes murder from manslaughter. *Moxley* v. *Commonwealth*, 195 Va. 151, 157, 77 S.E.2d 389, 393 (1953).

Premeditation is an essential element of the species of first degree murder at issue here. "To premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second degree murder." *Smith* v. *Commonwealth*, 220 Va. 696, 700, 261 S.E.2d 550, 553 (1980). That intent "may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Giarratano* v. *Commonwealth*, 220 Va. 1064, 1074, 266 S.E.2d 94, 100 (1980). "It is the will and purpose to kill, not necessarily the interval of time, which determine the grade of the offense." *Akers* v. *Commonwealth*, 216

Va. 40, 48, 216 S.E.2d 28, 33 (1975); *accord Hairston v. Commonwealth*, 217 Va. 429, 432, 230 S.E.2d 626, 628 (1976).

Although "[m]alicious intent is an element of both first degree murder and second degree murder", *Baker v. Commonwealth*, 218 Va. 193, 195, 237 S.E.2d 88, 89 (1977), for purposes of second degree murder, proof of specific intent *to kill* is not required; the will and purpose to kill may be implied by the degree of turpitude reflected in the conduct of the criminal agent. *See Pugh v. Commonwealth*, 223 Va. 663, 668, 292 S.E.2d 339, 341-42 (1982). In a second degree murder appeal decided more than a century ago, this Court approved an instruction that told the jury that if "the prisoner, in the execution of a malicious purpose to do the deceased a serious personal injury or hurt, by wounding and beating him, killed him, the offense is murder." *Dock's Case*, 62 Va. (21 Gratt.) 909, 913 (1872). Again, in *McDaniel v. Commonwealth*, 77 Va. 281, 286, (1883), this Court emphasized that "if it may be reasonably inferred . . . from any . . . circumstance, that the [killer] intended merely to do some great bodily harm, such homicide will be murder in the second degree . . . but not a case of murder in the first degree." *See also Boggs v. Commonwealth*, 153 Va. 828, 835, 149 S.E. 445, 447 (1929).

On the other hand, premeditated murder, one of the forms of first degree murder defined by statute, contemplates: (1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent. Premeditation and formation of an intent to kill seldom can be proved by direct evidence. A combination of circumstantial factors may be sufficient. *Epperly v. Commonwealth*, 224 Va. 214, 232, 294 S.E.2d 882, 892-93 (1982).

In *Epperly*, the jury heard evidence to show the nature and extent of the injuries inflicted upon the deceased; the physical disparity between the accused and his victim; the defendant's concealment of the fruit of his crime and other efforts to avoid detection; the defendant's lack of remorse; and the defendant's motive to silence the only witness who might convict him of the sexual crime he had committed. We held that this combination of factors was sufficient "to support the jury's finding that the killing . . . was not only malicious, but also willful, deliberate, and premeditated." *Id.*

In its opinion affirming the judgment of the trial court, the Court of Appeals invoked the rule applied in *Epperly*. We think the Court of Appeals erred; *Epperly* is clearly distinguishable. True, the accused in this case was an adult and the victim an infant, and the deceased suffered grievous injuries caused by a number of blows struck on several occasions. With respect to all other circumstantial factors detailed in *Epperly*, however, this case is significantly different. Unlike the defendant in *Epperly*, Mrs. Rhodes was guilty of no effort to conceal evidence or avoid the risk of detection and blame; to the contrary, she initiated a call for medical help for a child who had suffered respiratory problems from birth. Nor was Mrs. Rhodes guilty of a lack of remorse; rather, all who saw her — the paramedics and the doctors at both hospitals — described her as "crying", "distraught", "hysterical", and "fainting". And in *Epperly*, there was evidence pointing to motive, a factor which we said "is relevant and often most persuasive upon the question of . . . intent." *Id.* at 232, 294 S.E.2d at 892-93. We find no evidence of motive here.

■ We do not mean to suggest that each and every factor mentioned in *Epperly* is essential to the application of the rule applied there. As our decision in that case illustrates, we will affirm a conviction of premeditated murder, even though based upon wholly circumstantial evidence, whenever we can say that the reasonable import of such evidence, considered as a whole, is sufficient to show beyond a reasonable doubt that the accused was the criminal agent and that he acted with a premeditated intent to kill.

■ We agree with the Attorney General that the evidence reasonably supports an inference that the defendant inflicted all the injuries Kristie suffered, including those that proved fatal. Although a jury might properly find such conduct sufficient to imply the element of malice, we hold that the evidence is insufficient to show that Mrs. Rhodes acted with a premeditated intent to kill. "[T]his intent being lacking, there could be no murder in the first degree." *Pannill* v. *Commonwealth*, 185 Va. 244, 256, 38 S.E.2d 457, 463 (1946) (reversing conviction of father whose daughter died of skull fracture caused by beating administered by father).

Granting the defendant's prayer on appeal, we will reverse the decision of the Court of Appeals, vacate the judgment convicting the defendant of first degree murder, and remand the case to the Court of Appeals with direction to remand the case to the trial court with instructions that the defendant be tried for no offense

greater than second degree murder. *See Greene* v. *Massey*, 437 U.S. 19, 25 n.7 (1977); *Burks* v. *United States*, 437 U.S. 1 (1977).

*Reversed and remanded.*