COURT OF APPEALS OF VIRGINIA

Present: Judges Frank, McClanahan and Senior Judge Coleman
Argued at Richmond, Virginia


JAMES EDWARD KNIGHT, II

OPINION BY
v.      Record No. 0555-02-2                    JUDGE ROBERT P. FRANK
                                                NOVEMBER 4, 2003
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF LUNENBURG COUNTY
William L. Wellons, Judge

Sandra M. Saseen, Senior Assistant Public Defender, for appellant.

Eugene Murphy, Assistant Attorney General (Jerry W. Kilgore,
Attorney General, on brief), for appellee.


James Edward Knight, II (appellant), was convicted by a jury of capital murder, in violation of Code § 18.2-31(12).[1] On appeal, he contends the evidence was insufficient as a matter of law to prove premeditation. For the reasons stated, we affirm his conviction.

BACKGROUND

On July 31, 2000, when Cheyenne Knight was born to appellant and Alana Jackson, she suffered from gastrochisis, a condition where "the intestinal content are [sic] outside the abdomen." Surgery corrected the condition. On September 7, 2000, at her first visit to the doctor's office after leaving the hospital, Cheyenne weighed six pounds and two ounces and was healthy.

On September 10, 2000, at approximately 4:04 a.m., paramedics responded to an emergency call at appellant's mother's house. Cheyenne was "basically flaccid and lifeless."

_____

[1] While the jury imposed the death penalty, the trial court sentenced appellant to life imprisonment without parole, in accordance with Code § 19.2-264.5.

Thomas Hoover, a paramedic, noticed "a deformity to the child's head," which "appeared to be swollen." Hoover asked whether she had fallen. Appellant responded, "[T]he child was in the bed." Cheyenne was transported to Southside Community Hospital, accompanied by appellant and the paramedics. Several witnesses testified appellant was crying, "very upset, very panicked" on the morning the paramedics arrived.

A triage nurse at Southside asked appellant, "Did the baby suffer any kind of fall or anything like that?" Appellant responded in the negative. The nurse confirmed the baby's head was "[v]ery misshapen on the right side."

An emergency room physician, Janette Mamuric, interviewed appellant at the hospital, asking whether the child suffered any trauma. Again, appellant replied in the negative. A CAT scan revealed skull fractures. Dr. Mamuric testified that, had she been told the child suffered a traumatic injury, a proper diagnosis and treatment would have been expedited.

Cheyenne ultimately was transported to MCV hospital in Richmond. Dr. Samuel T. Bartle examined Cheyenne and opined that she had "some type of blunt force" injury to the skull. He described her condition as a "very significant close head injury," involving several skull fractures and bleeding in or around the brain. He noted, "Injuries like this you would see in a child who has been in a car, in a car [c]rash, that was ejected and was thrown so many feet after traveling 55 miles per hour." Dr. Bartle further explained that such trauma injuries have a "golden hour," referring to the need to have the victim transported immediately following the injury to a trauma center. After this "golden hour," "the percentage of survival drops off." He also explained that, since an infant's skull is "much more plastic," "more force is required to fracture an infant's skull than it does [sic] to [fracture] an adult skull."

Dr. William T. Gromley, a forensic pathologist, performed the autopsy. He testified the injuries to the child's head were "primarily in this frontal portion of the head and on the right

side." The cause of death was "blunt force injuries to the brain." The pathologist could not opine whether more than one blow caused the injuries.

On the evening of September 10, 2000, appellant and his mother arrived at the Lunenburg County Sheriff's Office. Jeff Paul, a deputy sheriff who knew nothing about the death of Cheyenne, interviewed appellant. Paul read appellant his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Appellant then explained that he was taking care of Cheyenne and that she began to cry. He went into her room and decided to stay with his daughter and watch television. As he reached over Cheyenne to get some VHS tapes, the tapes dropped, and one tape hit her on the head. When appellant picked her up, he noticed "the side of her head was swollen," and her breathing was difficult. He took the child to his mother's bedroom, and she called the rescue squad.

Appellant told Deputy Paul that, when the medical personnel at the hospital asked what had happened, he replied he did not know rather than telling them about the tapes. He explained, "I did not want anyone thinking bad of me," adding, "the last thing I needed was someone coming in and making me seem like a bad father."

Deputy Paul and Sheriff Wesley D. Adams later interviewed appellant at his mother's home. The interview was videotaped in the room where the incident occurred. Appellant repeated his story that Cheyenne was injured when some videotapes accidentally fell on her. After they turned off the video recorder, Sheriff Adams told appellant he did not believe falling videotapes "could have killed that child." The sheriff asked appellant if he wanted to "tell us what really happened." Appellant said he would. Everyone returned to the same room in the house and continued video recording the interview.

This time, appellant explained to the officers that he had been asleep and awoke to hear the infant's crying. He tried to feed her, but she would not eat. She kept crying. He explained,

"I was not angry with her, but before I knew it, I had struck her in the back of the head with my right fist." Appellant weighed approximately 200 pounds at the time.

After he was taken to the magistrate and charged, appellant gave a signed, written statement to the officers confirming the videotaped statement.

After gathering some information from the medical examiner, Deputy Paul interviewed appellant again, this time while appellant was in jail. Appellant "seemed to be in good spirits and was happy to see" the deputy. During this interview, appellant was calm and did not cry.

In his statement at the jail, appellant said he had fed Cheyenne, but afterwards she started crying. He tried to feed her again, "but she wouldn't take the bottle." He then "squeezed her stomach and she passed gas." He began feeding the child again, but she stopped drinking and started to cry. He then "choked her until her face started turning blue, and [he] then stopped choking her and laid her on the bed." When the child continued to cry, he "struck her on the side of her head," hitting her "hard enough to push her into the wall." Because the child then started to get quiet, he placed her on her stomach and put a pillow on top of her.

Appellant then left the room and fell asleep while watching television. However, he was awakened by Cheyenne's crying and returned to the infant's bedroom. At that point:

> She was still crying, so I walked over to the bed and hit her again through the pillow. I hit her harder this time and there was a loud pop.

Appellant again explained why he did not tell the medical personnel or the police what occurred. "I didn't tell anyone what happened because I didn't want social services to take my daughter from me." Appellant told Deputy Paul, "[D]uring the process of harming his daughter, he was never angry."

At trial, appellant gave yet another version of the incident. He claimed Cheyenne was crying around 3:20 a.m. and woke him. He entered her room without turning on the lights, and

he tripped over a baby bottle. While falling, he grabbed a shelf that acted as a headboard above the bed. He testified, "My weight yanked off the headboard and -- and it caused the headboard to fall onto the bed, hitting Cheyenne on the head." Appellant claimed he "panicked" when he saw the shelf on the bed after they called the rescue squad. He then re-nailed the shelf to the wall. He claimed his mother never had a chance to see the shelf off the wall.

Appellant admitted he did not tell anyone about the shelf. He explained his statements to the officers "got worse" because he "did not care" after the death of his daughter. He claimed he told Deputy Paul that he hit Cheyenne with such force that he heard a "pop" because that story was what the deputy wanted to hear.

At the conclusion of all the evidence, appellant moved to strike the evidence, arguing the evidence was insufficient to prove premeditation. The trial court denied that motion.

ANALYSIS

On appeal, appellant contends, as a matter of law, the evidence did not support a finding of premeditation. We disagree.

When reviewing sufficiency arguments on appeal, we review the evidence and the inferences fairly deducible from that evidence in the light most favorable to the Commonwealth. Snow v. Commonwealth, 33 Va. App. 766, 774, 537 S.E.2d 6, 10 (2000). We will not disturb the fact finder's verdict unless that decision was plainly wrong or without evidence to support it. Ashby v. Commonwealth, 33 Va. App. 540, 548, 535 S.E.2d 182, 186-87 (2000). In determining whether the verdict was plainly wrong or not supported by the evidence, we examine both the direct and circumstantial evidence in the record. Rhodes v. Commonwealth, 238 Va. 480, 486, 384 S.E.2d 95, 98 (1989); see also Hagy v. Commonwealth, 35 Va. App. 152, 159, 543 S.E.2d 614, 617 (2001) (finding circumstantial evidence is sufficient to support a verdict if it excludes every reasonable hypothesis of innocence that flows from the evidence).

An essential element of a first-degree murder conviction is premeditation, i.e., the development in the mind of the murderer of the specific intent to kill prior to the act itself. Code § 18.2-32 (defining first-degree murder); Betancourt v. Commonwealth, 26 Va. App. 363, 372-73, 494 S.E.2d 873, 877 (1998) (defining premeditation). This specific intent "may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." Giarratano v. Commonwealth, 220 Va. 1064, 1074, 266 S.E.2d 94, 100 (1980).

Appellant contends Rhodes v. Commonwealth, 238 Va. 480, 384 S.E.2d 95 (1989), requires that we reverse his conviction. We disagree.

Rhodes was tried for the premeditated murder of her infant daughter, who had a healing fracture of the left leg, new and old bruises, and skull fractures. Id. at 482, 384 S.E.2d at 96. The doctor also found "'retinal hemorrhages . . . diagnostic of severe shaking and trauma to the head.'" Id. The cause of death was "brain damage resulting from skull injuries," inflicted by "'blunt impact.'" Id. at 483, 384 S.E.2d at 97.

Rhodes never made any inculpatory statements. Id. Instead, she said she found the child choking and attempted mouth-to-mouth resuscitation. Id. at 484, 384 S.E.2d at 97. When that failed, she claimed she slapped the child on the leg and then shook her. Id. Rhodes then called the rescue squad. Id. She told a social worker a different version: that she went to prepare a bottle, heard a "'thump,'" and returned to find the baby lying on the floor. Id. A doctor testified a fall from the couch was not consistent with the baby's injuries. Id. at 484-85, 384 S.E.2d at 97-98.

In analyzing premeditation, the Rhodes Court cited Epperly v. Commonwealth, 224 Va. 214, 294 S.E.2d 882 (1982):

> In Epperly, [id. at 232, 294 S.E.2d at 892-93,] the jury heard
> evidence to show the nature and extent of the injuries inflicted

upon the deceased; the physical disparity between the accused and his victim; the defendant's concealment of the fruit of his crime and other efforts to avoid detection; the defendant's lack of remorse; and the defendant's motive to silence the only witness who might convict him of the sexual crime he had committed. We held that this combination of factors was sufficient "to support the jury's finding that the killing . . . was not only malicious, but also willful, deliberate, and premeditated." Id.

In its opinion affirming the judgment of the trial court, the Court of Appeals invoked the rule applied in Epperly. We think the Court of Appeals erred; Epperly is clearly distinguishable. True, the accused in this case was an adult and the victim an infant, and the deceased suffered grievous injuries caused by a number of blows struck on several occasions. With respect to all other circumstantial factors detailed in Epperly, however, this case is significantly different. Unlike the defendant in Epperly, Mrs. Rhodes was guilty of no effort to conceal evidence or avoid the risk of detection and blame; to the contrary, she initiated a call for medical help for a child who had suffered respiratory problems from birth. Nor was Mrs. Rhodes guilty of a lack of remorse; rather, all who saw her -- the paramedics and the doctors at both hospitals -- described her as "crying," "distraught," "hysterical," and "fainting." And in Epperly, there was evidence pointing to motive, a factor which we said "is relevant and often most persuasive upon the question of . . . intent." Id. at 232, 294 S.E.2d at 892-93. We find no evidence of motive here.

We do not mean to suggest that each and every factor mentioned in Epperly is essential to the application of the rule applied there. As our decision in that case illustrates we will affirm a conviction of premeditated murder, even though based upon wholly circumstantial evidence, whenever we can say that the reasonable import of such evidence, considered as a whole, is sufficient to show beyond a reasonable doubt that the accused was the criminal agent and that he acted with a premeditated intent to kill.

238 Va. at 486-87, 384 S.E.2d at 98-99. Thus, we apply the Epperly factors in analyzing the sufficiency of the evidence to prove premeditation.

One factor applied in Epperly was the brutality of the assault. Epperly, 224 Va. at 232, 294 S.E.2d at 892. Here, the jury heard considerable evidence as to Cheyenne's skull fractures, caused by "blunt force trauma." The infant's head was "very misshapen on the right side." The MCV pediatrician compared the severity of her injury to one suffered by someone "thrown so

many feet after travelling 55 miles per hour."  The infant's skull, more pliable than an adult's, required significant force to fracture.  Knight admitted he struck Cheyenne several times that morning, at different intervals, eventually hitting her with enough force that he heard her skull "pop."  The jury had sufficient evidence to find the killing was brutal.

Another Epperly factor is "the physical disparity between the accused and his victim." Rhodes, 238 Va. at 486, 384 S.E.2d at 98.  Appellant was an adult, weighing over 200 pounds. The victim was a helpless six-week-old child, weighing six pounds, two ounces.

Epperly also considered attempts to conceal the crime as relevant to determinations of premeditation.  Id. at 487, 384 S.E.2d at 99.  In this case, while appellant did not conceal the infant's body,[2] he clearly concealed the cause of the child's injuries, not only from the police, but also from emergency and medical personnel.[3]  Further, appellant gave no less than five different accounts of how the baby was injured.  Clearly, appellant attempted to conceal his role in Cheyenne's death.

Appellant argues his remorse, as evidenced by his tears and emotional behavior at the hospital and during the videotaped statement, militates against the premeditation factors in Epperly.  Various witnesses did, in fact, characterize appellant's demeanor at the emergency room as "upset."  A paramedic testified appellant was "emotional" and teary.  Appellant and his mother both testified that he was distraught, crying, "nervous and shaking" after the incident.  At times, he was emotional during the videotaped interview.

---

[2] Although appellant did not call the ambulance, he did take the child to his mother for her assistance.

[3] Appellant's failure to advise medical personnel of the cause of her condition delayed any potentially effective treatment for Cheyenne.  Her chances of survival were significantly compromised by appellant's deception.

Yet, the sheriff's personnel gave a different version of appellant's emotional state. When Deputy Paul re-interviewed him at the regional jail the day after his daughter died, appellant "seemed to be in good spirits and was happy to see [the officer]." His demeanor was characterized as "calm." He did not cry. "He was just a normal, everyday person . . . ."

The jury also had an opportunity to evaluate appellant's emotional state at the time of his daughter's death. They saw the videotaped statement taken in his home after Cheyenne died. While appellant exhibited some emotion during this interview, he also appeared concerned about how other people would view his actions. The jury could determine from this evidence that his emotions were the result of concern for his own predicament and not regret over his actions. The evidence supports a conclusion that appellant's only concern was for himself and not remorse for killing his daughter.

Given his testimony, the fact finder could conclude appellant was more concerned about other people's impression of him than he was about getting appropriate treatment for his daughter. In explaining his failure to tell the medical personnel how the traumatic injury occurred, appellant said, "I did not want anyone thinking bad of me." "[T]he last thing I needed was someone coming in and making me seem like a bad father." Thus, at a time when specific knowledge of the circumstances leading to the injury possibly could have saved Cheyenne, appellant chose not to advise the medical personnel of the true nature of his child's injury, but, instead, chose to protect himself by refusing to explain how the injury occurred.

The Supreme Court of Virginia noted in Epperly, "While motive is not an essential element of the crime, it is relevant and often most persuasive upon the question of the actor's intent." 224 Va. at 232, 294 S.E.2d at 892-93. Motive was not developed in the instant case. The Supreme Court, however, noted in Rhodes that it did "not mean to suggest that each and

every factor mentioned in <u>Epperly</u> is essential to the application of the rule applied there." 238 Va. at 487, 384 S.E.2d 99.

Further, <u>Rhodes</u> is distinguishable on its facts from this case. Rhodes gave no inculpatory statements admitting that she deliberately inflicted severe injury to her child, although evidence of child abuse was included in the record. Additionally, her remorse was unchallenged.

Here, appellant admitted inflicting a series of brutal assaults upon the infant and also indicated he was not angry with the child. He told the police that he "choked her until her face started turning blue" because she would not stop crying. He then hit her on the side of the head "hard enough to push her into the wall." Appellant then left the room, fell asleep, and was awakened by the child's crying. When he returned to Cheyenne's room, he "hit her harder this time and there was a loud pop."

Throughout these series of assaults, appellant said he was never angry. Although he was concerned people would consider him a bad father, he did not express regret over the loss of his daughter's life when he made his statements to the police. He admitted he did not put his daughter's interests first when the doctors needed information from him. While some evidence indicates he was emotional, at times, at the hospital and during the videotaped interview, other evidence suggests appellant was not remorseful about the injury to his daughter. The jury, after hearing appellant's testimony, was entitled to discount his explanation of his emotional state. <u>See</u> <u>Zook v. Commonwealth</u>, 31 Va. App. 560, 571, 525 S.E.2d 32, 37 (2000) (noting juries can reject testimony they determine is not credible).

The jury was properly instructed on premeditation. From the evidence, they could conclude appellant's attack was premeditated, based on the brutality of the attack, the disparity in size, his efforts to conceal his guilt, including his conflicting explanations of the incident, <u>see</u>

<u>Dowden v. Commonwealth</u>, 260 Va. 459, 469-70, 536 S.E.2d 437, 442 (2000) (finding a jury can infer guilt when they believe a defendant has lied), the period of time between the two blows, his lack of remorse, and his admission that he inflicted severe blows to the child's head.

<u>CONCLUSION</u>

We find the evidence was sufficient to support the jury's finding of capital murder.

<u>Affirmed.</u>