COURT OF APPEALS OF VIRGINIA

Present:   Judges Chafin, Malveaux and Senior Judge Frank
Argued at Norfolk, Virginia

UNPUBLISHED

FLOYD WILLIAM LOGAN, IV

v.        Record No. 0867-15-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE MARY BENNETT MALVEAUX
NOVEMBER 1, 2016

FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Marjorie Taylor Arrington, Judge

David L. Jones, Senior Assistant Public Defender (Dalton L. Glass,
Assistant Public Defender, on brief), for appellant

Robert H. Anderson, III, Senior Assistant Attorney General
(Mark R. Herring, Attorney General, on brief), for appellee.


Floyd William Logan, IV ("appellant") appeals his convictions of first-degree murder, in

violation of Code § 18.2-32, and felony child abuse, in violation of Code § 18.2-371.1(A).  He

contends that a rational fact-finder could not find beyond a reasonable doubt either that he

premeditated his daughter's murder or that he caused her fatal injuries.  We affirm both convictions.

I.  BACKGROUND

Late in the afternoon of August 15, 2012, W.B.'s brothers and sisters found her lying

dead in a bedroom she shared with her parents, Kiba Brown and appellant.  She was sixteen

months old at the time.

According to a number of witnesses, W.B. was fine earlier that day.  Brown's mental

health support counselor, Shaila Wylie, arrived shortly before 11:00 a.m. to take her to a doctor's

appointment.  Wylie observed that W.B. was sleepy but otherwise behaved normally.  Later,

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Brown's godson, Marquan Hunter, carried W.B. to the bedroom so appellant could change her diaper. He also noticed nothing unusual about her behavior. And when her sister, Daaiyah, entered the bedroom to retrieve some juice boxes, W.B. was playing normally on the foot of the bed while appellant rested.

Daaiyah left appellant and W.B. alone together in the bedroom. Both Marquan and Daaiyah saw appellant coming in and out of the bedroom at various times. Although Marquan admitted he could not always see the bedroom door, he never saw W.B. leave the bedroom and never saw anyone else go in.

At 3:11 p.m., another in-home counselor, Lachelle Elliott, arrived to meet with Brown's child, Samirah. Brown returned from her doctor's appointment a few minutes later. While Brown, Elliott, and appellant were outside, the other children decided to wake W.B. Finding her lying at the head of the bed near the pillows, three of her siblings began jumping on the bed at its foot. When Marquan noticed W.B. had not responded to the bouncing, he told the others to stop jumping. Marquan and one of W.B.'s brothers, Khalil, checked her for signs of life. Both noticed that her lips were blue.

Khalil ran out to the yard, where Brown and Elliott were talking as appellant loaded his truck. When they learned W.B. was unwell, the adults ran to the bedroom. Brown began screaming, and Marquan noticed that appellant was also upset. As Marquan, Elliott, and Brown each called 911, appellant attempted to resuscitate his daughter, using both hands and his full arms to compress W.B.'s chest.

When paramedics arrived about seven minutes after the emergency call, they noticed that while W.B.'s core was warm, her limbs were already cool. A paramedic indicated that this meant that W.B. was "without breath and cardiac activity for a period of time." Some of the first responders also noted that while Brown was inconsolable, appellant was quiet.

An autopsy later revealed three separate, acute fractures to W.B.'s skull on three different sides of her head. The autopsy also found a number of fractured ribs—some of which apparently had been broken weeks before her death. W.B.'s chest bore a number of smaller, superficial bruises. Blunt force trauma to her abdomen split her liver nearly in two and caused a significant fracture to her pancreas. These wounds caused massive internal hemorrhaging.

Appellant gave a number of inconsistent explanations about what happened that day. He first told paramedics that he discovered W.B. when he woke up from a nap. Soon afterwards, he told a police officer that he was outside getting ready to leave with Brown when one of the children came to say something was wrong with his daughter. During two interviews with detectives, appellant repeatedly denied doing anything to harm his daughter. But he gave inconsistent accounts of his own movements. In his first interview, he claimed that after changing W.B.'s diaper, he left her napping in the bedroom. In his second interview, he told detectives that he remained in the bedroom watching Netflix until Elliott arrived.

During appellant's bench trial, the medical examiner, Dr. Jeffery Gofton, testified that W.B. died from blood loss caused by at least four blows. Based on her three skull fractures, Dr. Gofton concluded that someone struck W.B.'s head at least three times. He also opined that W.B. must have suffered at least one serious blow to her torso.

A pediatrician specializing in child abuse, Dr. Michelle Clayton, agreed with those conclusions. She noted that "a very high level of force" must have been used to fracture W.B.'s occipital bone, the strongest portion of her skull. And she opined that in light of the extent and severity of W.B.'s injuries, any accidental cause would have been analogous to being thrown from an automobile crash or landing on concrete after falling several stories.

Dr. Clayton also opined that the bruises on W.B.'s chest had the characteristic size and shape of an adult's fingertips and knuckles, suggesting that an adult had caused them by striking

the child.  Although Dr. Gofton acknowledged that such bruises could result from resuscitation, both doctors agreed this was unlikely because bruising usually requires a heartbeat.

Testimony also established that appellant was the only adult in the home from approximately 11:30 a.m. until 3:11 p.m..  No other adult entered the bedroom that afternoon until after the children found W.B.'s body.  Marquan, the oldest minor in the home, was fifteen years old at the time and is slight of build.   Khalil was twelve, and Daaiyah was ten.  None of the remaining children—including any of the children who jumped on the bed—was older than eight years of age.[1]

The trial court denied appellant's motions to strike the Commonwealth's evidence and found him guilty of both charges.  The court determined that appellant was the only person in the home with the opportunity to cause W.B.'s fatal injuries.  The court also found that appellant premeditated the murder, emphasizing the disparity of size between appellant and W.B., the brutality of the attack, and appellant's apparent lack of remorse.

## II.  ANALYSIS

After a bench trial, an appellate court may not set aside the judgment of the trial court "unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it."  Code § 8.01-680; Williams v. Commonwealth, 278 Va. 190, 193, 677 S.E.2d 280, 282 (2009).  This Court reviews the evidence "in the light most favorable to the Commonwealth, as the prevailing party at trial, and considers all inferences fairly deducible from that evidence." Powell v. Commonwealth, 289 Va. 20, 26, 766 S.E.2d 736, 738 (2015) (quoting Allen v. Commonwealth, 287 Va. 68, 72, 752 S.E.2d 856, 858-59 (2014)).  "[T]he relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a

---

[1] Including W.B., Marquan, Daaiyah, and Khalil, there were eight children in the home that day.  Aamir Brown was eight years old.  Samirah Brown was seven.  Halimah Brown was two.  Their cousin, Nakhari Mohammed, was four.  Aamir was the only other child to testify at appellant's trial.

reasonable doubt.'" Williams, 278 Va. at 193, 677 S.E.2d at 282 (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). "Circumstantial evidence of guilt is sufficient to support a conviction when the Commonwealth's evidence excludes every reasonable hypothesis except guilt." Stockton v. Commonwealth, 227 Va. 124, 146, 314 S.E.2d 371, 385 (1984).

Murder of the first degree includes "any willful, deliberate, and premeditated killing" that would not otherwise be defined as capital murder. Code § 18.2-32. The same offense may also give rise to liability for felony child abuse if the victim was a minor under the accused's care:

> Any parent, guardian, or other person responsible for the care of a child under the age of 18 who by willful act or willful omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of such child is guilty of [child abuse and neglect].

Code § 18.2-371.1(A).

Appellant contends that the evidence cannot support a conviction of first-degree murder. He argues that a rational fact-finder could not have found that he premeditated W.B.'s killing. He further argues that the evidence could not prove beyond a reasonable doubt that he inflicted W.B.'s fatal injuries. For similar reasons, he challenges the sufficiency of the evidence proving that he caused the injuries underlying his child abuse conviction. We disagree with each of his arguments.

A. The Evidence Is Sufficient To Support Appellant's First-Degree Murder Conviction.

1. A reasonable trier of fact could find that appellant premeditated W.B.'s murder.

Appellant first argues that the evidence is insufficient to allow any fact-finder to convict him of first-degree murder because there is no proof of premeditation. Thus, he contends that the trial court could have convicted him only of murder in the second degree. We disagree.

Premeditation, or the "adopt[ion] [of] a specific intent to kill . . . is what distinguishes first and second degree murder." Smith v. Commonwealth, 239 Va. 243, 259, 389 S.E.2d 871,

- 5 -

879 (1990) (quoting Rhodes v. Commonwealth, 238 Va. 480, 485, 384 S.E.2d 95, 98 (1989)). Although the accused need not have planned the killing for any specific period of time, "[t]he intent to kill must come into existence at some time before the killing." Smith v. Commonwealth, 220 Va. 696, 700, 261 S.E.2d 550, 553 (1980).

By its very nature, "premeditation . . . seldom can be proved by direct evidence" and must instead be established circumstantially. Rhodes, 238 Va. at 486, 384 S.E.2d at 98. Circumstantial factors related to the killing itself, including the "brutality of the attack, and whether more than one blow was struck, [and] the disparity in size and strength between the defendant and the victim" can support a reasonable inference of premeditation. Avent v. Commonwealth, 279 Va. 175, 208, 688 S.E.2d 244, 262 (2010) (quoting Epperly v. Commonwealth, 224 Va. 214, 232, 294 S.E.2d 882, 892 (1982)). A fact-finder may also infer the accused's premeditation from conduct after the killing, including efforts to conceal the body, lack of remorse, and efforts to avoid detection. Id.

In Knight v. Commonwealth, 41 Va. App. 617, 625, 587 S.E.2d 736, 740 (2003), this Court held that evidence of an especially brutal beating supported a jury's finding that a father premeditated the murder of his infant daughter. Knight's daughter died after receiving several severe skull fractures resulting from blunt force trauma. See id. at 619, 587 S.E.2d at 737. Although medical experts could not opine as to the number of blows that caused the injuries, a pediatrician observed that he might see similar injuries "in a child who has been . . . in a car crash . . . and was thrown so many feet after traveling 55 miles per hour." Id. Knight eventually admitted to hitting his daughter several times until she stopped crying. See id. at 621, 587 S.E.2d at 738. This Court concluded from the number and severity of the blows that "[t]he jury had sufficient evidence to find the killing was brutal." Id. at 625, 587 S.E.2d at 740.

Similarly, the evidence here shows that W.B.'s murder was especially brutal. Both testifying physicians agreed that W.B. was struck at least four times to cause her skull fractures and internal injuries. The blows that fractured her occipital bone and destroyed her liver must have been particularly severe. Dr. Gofton noted that because the liver is partially protected by the rib cage as well as a layer of fatty tissue, splitting the organ in half by blunt force trauma would require significant force. Dr. Clayton underscored the violence of the attack when she testified that the injuries suffered by W.B. would be present in an unrestrained car crash victim, who was thrown from a vehicle or someone who fell several stories from a building.

A fact-finder reasonably could infer from the scope and degree of the injuries suffered by the toddler that appellant intended to kill W.B. when he beat her. The infliction of multiple blows and the size disparity between the appellant and his sixteen-month-old daughter could further support that inference.

Appellant emphasizes, however, that he later attempted to revive W.B.. Relying on Rhodes, he contends that his resuscitative efforts negate any inference of his intent to kill. His reliance is misplaced. In Rhodes, the defendant called emergency services to ask for help after beating her infant daughter into unconsciousness. 238 Va. at 482, 384 S.E.2d at 96. Nothing in that case suggested Rhodes deliberately delayed calling for help; rather, Rhodes's daughter was still alive when paramedics arrived. See id. Our Supreme Court determined from both the emergency call and from Rhodes's unquestionably distraught reaction that she neither concealed her crime nor lacked remorse. Id. at 487, 384 S.E.2d at 99. The Court concluded that the evidence, taken as a whole, was insufficient to prove premeditation. Id.

In this case, however, appellant did nothing to help W.B. while she was still alive. Prior to the children's entry into the bedroom, appellant appeared to rush Brown out of the house. Because W.B.'s limbs had already cooled by the time paramedics arrived, W.B. must have been

dead when her siblings found her. The doctors' testimony also indicates that the toddler was deceased when resuscitation was administered. Appellant was the only person with W.B. prior to the children's discovery of her body. A reasonable fact finder could determine that appellant was aware of W.B.'s condition and did nothing to assist until others detected her condition.

Appellant's failure to seek help for W.B. reasonably supports a finding that he attempted to conceal his crime and avoid its consequences. Cf. Knight, 41 Va. App. at 625 n.2, 587 S.E.2d at 740 n.2 (determining that Knight did not conceal his daughter's body because while he did not call 911 after the attack, "he did take the child to his mother for her assistance"). His inconsistent explanations for what happened that day further support this finding.

Finally, a fact-finder could have found that appellant lacked remorse for his crime from his demeanor at the crime scene. While the trial judge acknowledged that some witnesses described appellant as upset, others observed that he appeared reserved while paramedics worked on his daughter. Cf. Knight, 41 Va. App. at 626, 587 S.E.2d at 740-41 (noting that a jury could resolve conflicting testimony about the defendant's emotional state and find that the defendant lacked remorse).

Here, we must affirm if the "evidence, considered as a whole, is sufficient to show beyond a reasonable doubt that the accused . . . acted with a premeditated intent to kill." Rhodes, 238 Va. at 487, 384 S.E.2d at 99. The evidence demonstrated that appellant inflicted brutal injuries on his young daughter, failed to seek help for her after causing these injuries, and seemed to lack remorse. A rational trier of fact could find from this evidence that appellant premeditated his daughter's murder.

## 2. A fact-finder reasonably could reject appellant's hypothesis of innocence.

Alternatively, appellant asserts that the trial court could not have found him guilty of murder because W.B.'s siblings could have caused her fatal injuries by jumping on her bed and play fighting. His argument is unpersuasive.

While the Commonwealth's circumstantial evidence must exclude every reasonable hypothesis of innocence, see Stockton, 227 Va. at 146, 314 S.E.2d at 385, "[w]hether the hypothesis of innocence is reasonable is itself a 'question of fact,'" Clanton v. Commonwealth, 53 Va. App. 561, 572, 673 S.E.2d 904, 910 (2009) (*en banc*) (quoting Emerson v. Commonwealth, 43 Va. App. 263, 277, 597 S.E.2d 242, 249 (2004)). Although "a factfinder cannot 'arbitrarily' choose" between theories of the case, such a choice is arbitrary "only when no rational factfinder could believe the incriminating interpretation . . . and disbelieve the exculpatory one." Vasquez v. Commonwealth, 291 Va. 232, 250, 781 S.E.2d 920, 930 (2016). The critical question "is not whether 'some evidence' supports the hypothesis, but whether a rational factfinder could have found that the incriminating evidence renders the hypothesis of innocence unreasonable." Id.

In this case, the evidence is more than sufficient to render appellant's theory of the case untenable.

First, the expert testimony in this case tended to suggest that causing W.B.'s injuries would require more strength than a child would possess. Dr. Clayton testified that fracturing W.B.'s occipital bone would have required a high degree of force. Likewise, Dr. Gofton opined that "[i]t is not easy" to sever a liver because "it requires a large amount of force . . . ." He expressed a similar opinion about the fracture in W.B.'s pancreas. While neither expert could quantify exactly how much force was necessary to cause those wounds, Dr. Clayton testified unequivocally that the injuries were inconsistent with "play of any sort." Because appellant was

- 9 -

the only adult present, a rational fact-finder could infer that no one else in the home had the strength necessary to cause those injuries.

Additionally, Dr. Clayton testified that the bruises inflicted upon W.B. were consistent with an adult's hand, rather than a child's. While Dr. Gofton noted that appellant's improper resuscitation efforts could cause bruising, both he and Dr. Clayton agreed that such postmortem bruising was unlikely. The trial court reasonably found that an adult caused those bruises by striking W.B.

Appellant's assertion that W.B. could have suffered these injuries during rough horseplay also runs contrary to the children's testimony. Although appellant argues that the children's testimony as inconsistent, "[p]otential inconsistencies in testimony are resolved by the fact finder." Towler v. Commonwealth, 59 Va. App. 284, 292, 718 S.E.2d 463, 467 (2011). We may not revisit such conflicts on appeal "unless 'the evidence is such that reasonable [persons], after weighing the evidence and drawing all just inferences therefrom, could reach but one conclusion.'" Molina v. Commonwealth, 47 Va. App. 338, 369, 624 S.E.2d 83, 98 (2006) (quoting City of Bedford v. Zimmerman, 262 Va. 81, 86, 547 S.E.2d 211, 214 (2001)).

In this case, the lay witnesses corroborated each other's accounts in a number of important respects. Khalil agreed with Wylie that W.B. behaved normally on the morning of her death. Marquan and Daaiyah both testified that W.B. appeared healthy before she was left alone with appellant in the bedroom. Aamir, Khalil, and Marquan each testified unambiguously that when they went to wake W.B., no one ever jumped anywhere near her on the bed.

All of this evidence tends to refute appellant's theory that the children might have fatally wounded W.B. through earlier play fighting or by jumping on her bed. Because a reasonable fact-finder, "upon consideration of all the evidence, could have rejected [appellant's] theories in

his defense," Commonwealth v. Hudson, 265 Va. 505, 513, 578 S.E.2d 781, 785 (2003), the evidence was sufficient to prove that he murdered his daughter.

### B.  The Evidence Was Sufficient To Prove Appellant Caused The Injuries Underlying His Child Abuse Conviction.

Appellant finally argues that the trial court erred in overruling his motion to strike the evidence as to his child abuse conviction.  As with his murder conviction, he contends that the trial court could not have found him guilty beyond a reasonable doubt because W.B.'s siblings might have caused her injuries.  And for the same reasons, we disagree.  Dr. Clayton opined that W.B.'s injuries were not consistent with play of any sort.  The bruises on W.B.'s chest were consistent with an adult's hands.  And a rational fact-finder could have determined W.B.'s siblings lacked the strength necessary to cause her extraordinary injuries.  A reasonable trier of fact could have rejected appellant's hypothesis of innocence.

### III.  CONCLUSION

For the foregoing reasons, we affirm appellant's convictions of murder in the first degree and felony child abuse.

Affirmed.