Present:    All the Justices

COMMONWEALTH OF VIRGINIA
                              OPINION BY JUSTICE LEROY R. HASSELL, SR.
v.  Record No. 980325              November 6, 1998

WILLIAM ALAN PRESLEY

                FROM THE COURT OF APPEALS OF VIRGINIA

        In this appeal, we consider whether the evidence was

sufficient to support the defendant's conviction for voluntary

manslaughter.

        Tried in Loudoun County by a jury and convicted of

voluntary manslaughter, William Alan Presley was sentenced to

one year and six months imprisonment.  Presley appealed his

conviction to the Court of Appeals.  He asserted that the

evidence was insufficient to support his conviction because

the Commonwealth purportedly failed to prove that he killed

the victim, Sandra D. Laing.  The Court of Appeals, in an

unpublished opinion, agreed with the defendant, reversed the

judgment of the trial court, and set aside the conviction.

Presley v. Commonwealth, Record No. 2265-96-4 (January 20,

1998).  We awarded the Commonwealth an appeal.

        We have enunciated the following principles of appellate

review which are pertinent here.  When a defendant challenges

on appeal the sufficiency of the evidence to sustain his

conviction, it is the duty of an appellate court to examine

the evidence that tends to support the conviction and to

permit the conviction to stand unless the conviction is plainly wrong or without evidentiary support. Commonwealth v. Jenkins, 255 Va. 516, 520, 499 S.E.2d 263, 265 (1998); Tyler v. Commonwealth, 254 Va. 162, 165-66, 487 S.E.2d 221, 223 (1997). If there is evidence to support the conviction, an appellate court is not permitted to substitute its own judgment for that of the finder of fact, even if the appellate court might have reached a different conclusion. Jenkins, 255 Va. at 520, 499 S.E.2d at 265; Tyler, 254 Va. at 165-66, 487 S.E.2d at 223; Cable v. Commonwealth, 243 Va. 236, 239, 415 S.E.2d 218, 220 (1992).

Additionally, upon appellate review, the evidence and all inferences reasonably deducible therefrom must be examined in the light most favorable to the Commonwealth, the prevailing party in the trial court. Any evidence properly admitted at trial is subject to this review. Jenkins, 255 Va. at 521, 499 S.E.2d at 265.

The following facts are relevant to our disposition of this appeal. Presley, Laing, and William P. Rossbach resided together in a house in Loudoun County. Each of the occupants used a separate bedroom. Presley and Laing were described as "boyfriend" and "girlfriend," and they had a sexual relationship.

2

On July 31, 1995, about 4:30 p.m., Rossbach drove Laing in his car to visit a physician.  Laing had complained of having "the flu or something" and feeling "really sick." Laing and Rossbach returned from the doctor's office between 5:30 and 6:00 p.m.

Earlier that day, before Rossbach took Laing to the doctor's office, she stumbled and hit her head on a doorknob. In response to Rossbach's question "[a]re you all right up there?", Laing said, "Yeah.  I just kind of slipped."

About midnight on July 31, 1995, Sandra Everhart arrived at the house.  She went to Rossbach's bedroom, removed her clothing, and attempted to have sexual intercourse with him. Rossbach, who had "too much to drink," was unable to have sexual relations with Everhart.  Presley entered Rossbach's room and told Everhart, in Rossbach's presence, that Presley wanted to have sexual intercourse with her.  Presley and Rossbach began to argue, and Laing, who had heard the conversation, appeared at the door to the room.

Laing was upset, and she told Presley to leave the room. She also directed Everhart to leave.  Rossbach, in an effort to humiliate Presley, told Laing that he had not forgotten about a sexual affair that Laing had with a man named Tom. Presley had not known about this relationship.  Laing denied the relationship, but Presley became enraged.

Sometime between midnight and 1:00 a.m., after Everhart left the house, Rossbach heard "banging and stuff going on." Presley and Laing were in her bedroom arguing about the affair she purportedly had with Tom. Rossbach entered the bedroom, told Presley and Laing to "[c]ut it out," and went downstairs to the kitchen. While he was in the kitchen, Rossbach heard "a bunch of yelling," and he heard Laing say, "[p]lease don't hit me."

While Rossbach was walking up the stairs to return to his room, he heard Presley call Laing a "fucking bitch." Rossbach went to Laing's bedroom. She was on the floor naked, and Presley had "his hand around her throat." Rossbach said, "[w]hat the hell?" Presley, who was choking her, stopped. Presley "was pretty much just kind of yelling in grief, and [he] let [Laing] go as soon as [Rossbach] said 'what the hell is going on?'" Presley stated, "[s]orry, God. I really messed up." After Rossbach saw Presley with his hand around Laing's neck, she did not move. Later, when Rossbach entered Laing's room, he observed that she was clothed, lying on her bed, snoring.

Alvin D. Blankenship, a Virginia State Trooper, spoke with Presley by telephone sometime between midnight and 2:00 a.m. on August 1, 1995. Presley told Blankenship that Presley wanted the State Police to remove Laing from his house because

4

she "was a whore" and was "using drugs."  Presley also stated that "sometimes he [got] so mad that he just [felt] like knocking [Laing] in the head."  Blankenship warned Presley that if he committed any acts of violence, he would be arrested.  Presley responded that the Loudoun County Police always arrested him when the police officers went to his home.

About 1:46 a.m. on August 1, 1995, Sergeant Eric Noble, a deputy sheriff with the Loudoun County Sheriff's Department, responded to a call from the defendant's home regarding an unconscious female.  Sergeant Noble arrived at the house, Presley met him at the front door, and permitted him to enter.  When Sergeant Noble entered Laing's bedroom, she was lying on the floor, her breathing was extremely "ragged and labored, and [she] appeared to be in [a] very serious condition."

After Sergeant Noble used his radio to request medical help, he asked Presley what had happened.  Presley stated that "he beat the hell out of her on the floor, that he had hit her with the chair."  Sergeant Noble saw pieces of a broken chair above the victim's head.  He also observed a large tear on the right side of her shorts, a small amount of blood on the victim's left thigh, and small spots of blood on the carpet adjacent to her body.

Another deputy sheriff, Clete Kresge, arrived at Presley's residence.  Presley stated to Deputy Kresge twice,

5

"I'll admit I did hit her tonight." Presley also told Deputy Kresge later that morning, "[s]he had pissed me off tonight . . . I tore her to shreds." Kresge observed that the victim's blouse was torn, and her eye was discolored.

Everhart testified at trial that she did not notice any bruises or physical marks on the victim's face when she had been at Presley's house on July 31. Rossbach also testified that Laing's eye was not discolored, and she did not have bruises on her body before her altercation with the defendant.

Laing was transported to the Loudoun Hospital Center where she died at 4:14 a.m. Dr. Frances P. Field, an assistant chief medical examiner for the Northern Virginia District Medical Examiner's Office, performed an autopsy on Laing's body. Field observed that Laing's body had a bruise on the right eye and a small reddish abrasion or scrape mark on the left forehead. Her tongue was bruised, and numerous bruises were found on Laing's legs, back, arms, and elbow.

Dr. Field determined that Laing had a large subdural hematoma on the left side and top of her head. A subdural hematoma is an accumulation of blood between the covering and surface of the brain. Dr. Field performed a microscopic examination on blood taken from Laing's subdural hematoma. The absence of inflammatory cells on the dura indicated to Dr. Field that the hemorrhage was the result of "very recent

bleeding in the head, within several hours of death, or minutes . . . ." Dr. Field conducted a microscopic examination of the tissue around the victim's eye, and she concluded that the presence of intact red cells and a small infiltration of white blood cells or inflammatory cells indicated that this injury occurred within four hours of death. Dr. Field testified that the bruise on the back of the victim's left thigh and left elbow were received within several hours before death.

Dr. Field opined within a reasonable degree of medical certainty that the victim's subdural hematoma was caused by blunt force trauma. Dr. Field stated that the victim's history of chronic alcohol abuse, her extensive use of prescription drugs, the victim's malformed brainstem, and the curvature of her spine did not contribute to her death. Dr. Field testified that the victim's fall, which occurred before 4:30 p.m. on July 31, 1995, did not contribute to her death.

Presley adduced evidence at trial that the victim's death was attributable to causes other than his acts. Several factual witnesses testified that the victim had poor motor skills, that she fell frequently, and that she had bruises on her legs. Nicholas T. Lappas, who qualified as an expert witness on the subjects of toxicology and pharmacology, testified that in his opinion, Laing's death was consistent

7

with a drug overdose caused by the prescription medication that she had ingested.  Dr. John E. Adams, a forensic pathologist, testified that Laing's death was related to a congenital deformity of her spine and skull combined with her chronic liver disease.  Dr. Adams also opined that the cause of Laing's death was a "head injury with subdural hematoma, combined with drugs and alcohol."  Dr. John H. Lossing, a neurologist, testified that Laing died of suffocation because the "doctors in the emergency room were unable to successfully intubate her."  Finally, during the defendant's cross-examination of Dr. Field, she testified that the subdural hematoma occurred within 24 hours of the victim's death.

The Commonwealth must prove, as an essential element of its case, that the victim's death resulted from the criminal agency of the defendant.  Opanowich v. Commonwealth, 196 Va. 342, 355, 83 S.E.2d 432, 439-40 (1954).  We stated in Bowie v. Commonwealth, 184 Va. 381, 390, 35 S.E.2d 345, 348 (1945), that "[d]eath must be proved either by direct testimony or by presumptive evidence of the strongest kind; but the existence of the criminal agency as the cause of the death and the identity of the agency may be established by circumstantial evidence."

We hold that there is sufficient evidence of record which would have permitted the jury to find beyond a reasonable

8

doubt that Presley's acts caused Laing's death.  The jury, which considered all the evidence, was entitled to find that Presley hit Laing with a blunt object and that the resulting trauma produced the large subdural hematoma which caused her death.  Field's medical testimony, the substantial physical evidence, and Presley's admissions that "he beat the hell out of [Laing] on the floor" and that he had "tor[n] [Laing] to shreds" are facts which would support the jury's finding that Presley's acts caused the victim's death.

We do recognize that the defendant presented evidence that the victim's death may have been attributable to other causes.  However, it is the province of the jury, rather than an appellate court, to weigh the facts and to judge the credibility of the various lay and expert witnesses.

For these reasons, we will reverse the judgment of the Court of Appeals, and we will reinstate Presley's conviction in accordance with the trial court's judgment order.

Reversed and final judgment.

9