COURT OF APPEALS OF VIRGINIA


Present: Judges Benton, Bumgardner and Frank
Argued at Richmond, Virginia


DOROTHEA CHISOM MARTIN

                                    MEMORANDUM OPINION* BY
v.   Record No. 1296-99-3      JUDGE RUDOLPH BUMGARDNER, III
                                       AUGUST 22, 2000
COMMONWEALTH OF VIRGINIA


           FROM THE CIRCUIT COURT OF BOTETOURT COUNTY
                   George E. Honts, III, Judge

           Christopher K. Kowalczuk for appellant.

           Donald E. Jeffrey, III, Assistant Attorney
           General (Mark L. Earley, Attorney General, on
           brief), for appellee.


     A jury convicted Dorothea Chisom Martin of conspiracy to

murder her husband, James Martin. On appeal, she contends the

trial court erred in admitting statements of her co-conspirator

and in ruling the evidence was sufficient to convict her.

Finding no error, we affirm.

     Conspiracy is "'an agreement between two or more persons by

some concerted action to commit an offense.'" Cartwright v.

Commonwealth, 223 Va. 368, 372, 288 S.E.2d 491, 493 (1982)

(citation omitted). The hearsay statements of a co-conspirator

can be used as substantive evidence against the defendant if the

Commonwealth first establishes that a conspiracy existed from

─────────────
     * Pursuant to Code § 17.1-413, recodifying Code
§ 17-116.010, this opinion is not designated for publication.

other evidence.  "Once the Commonwealth has made out a prima facie case of conspiracy by circumstantial evidence, an out-of-court statement of a conspirator is admissible to prove the conspiracy."  Roger D. Groot, Criminal Offense and Defenses in Virginia 104 (4th ed. 1999) (citing Poole v. Commonwealth, 7 Va. App. 510, 375 S.E.2d 371 (1988)).  The defendant concedes that the burden to establish prima facie proof of a conspiracy is proof by a preponderance of the evidence.

At trial, the co-conspirator, Thomas "Butch" Gray, invoked his Fifth Amendment right and refused to testify.  After the trial court ruled the Commonwealth had established a prima facie case of conspiracy by other evidence, it admitted Gray's prior out-of-court statements as evidence against the defendant. Gray's statements admit that he and the defendant conspired to murder the defendant's husband.  If the trial court properly admitted the statements, they provided sufficient evidence to permit a conviction.

The defendant and James Martin were involved in an acrimonious and prolonged divorce that began in 1995.  In 1997 Gray told Martin that he had been having an affair with the defendant, and later he told Martin that he and the defendant had plotted to murder him.  Gray gave Martin tape recordings of Gray and the defendant talking about sex and even having sexual relations.  He showed Martin a rifle with a silencer and said, "this was made for you."  In July 1998, a jury convicted and

-

sentenced Gray to three years in the penitentiary for conspiracy to murder Martin.  The defendant was not charged at that point.

While waiting for the judge to impose sentence, Gray continued plotting to kill Martin.  Gray confided in another inmate housed in his cellblock, who feigned interest, but informed the Sheriff of Gray's intentions.  The Sheriff instructed the inmate to offer to put Gray in touch with a hired killer, "Jack Brisco," and to furnish Gray a telephone number for the fictitious hired killer.  The inmate gave Gray that information, and Gray acted on it.  The telephone number would actually connect to the Sheriff, who pretended to be "Jack Brisco" whenever Gray called that number.  After a series of calls, while thinking he was dealing with a hired killer, Gray arranged to have Martin killed.  He arranged for the hired killer first to get Martin to recant his testimony in hopes the trial judge would not impose the jury sentence and then to make the murder look like a suicide.  Gray furnished a map of Martin's house and sent a payment of $50 on August 7 and of $450 the following week.

Despite Gray's conviction in July 1998, the defendant maintained continual contact by telephone and mail. Investigators found nineteen letters in Gray's cell written by the defendant.  One dated July 14, 1998 stated that he would have to "read between the lines" because she would not write much in a letter that he could use against her.  The day Gray

-

first contacted his hired killer, she wrote that she could be in jail above him the following week. In letters dated August 5 and 6, 1998, the defendant professed her love for Gray, noted that she received the bills he wanted her to pay, and asked him to destroy her letters. Just before Gray mailed $450 to his hired killer, the defendant mailed him $450 with a note saying "hope this helps" and "Would you do the same for me?"

The defendant received several hundred telephone calls from Gray. Gray placed numerous calls to her place of work, the Fincastle post office. A postal employee testified that Gray called the defendant "almost daily." During July and August 1998, the post office received a large number of hang-up collect calls, but during one such call, the employee recognized Gray's voice "rambling on for a quick moment." Telephone records for Gray's cellblock showed that 270 collect calls were placed to the post office, but none were accepted.

The cellblock records showed that 316 calls were placed to the defendant's home between July 7 and August 19, 1998. Of those, 114 were completed. Many of the calls to the defendant's home coincided with calls from the cellblock to the hired killer's telephone number.

Around 8:40 p.m. on August 18, 1998, State Police Agent Michael Bass went to the defendant's home pretending to be the killer Gray had hired. Agent Bass advised the defendant that Gray had sent him and that Martin "was going to be done

-

tonight."  He explained that he expected her to give him a gun or $300 to purchase one.  The defendant denied knowing of any plot to kill Martin.  The agent asked if it was all right that Martin "was going to be killed tonight."  The defendant responded that it was not all right, but she never called the police or warned Martin after the agent left.

At 1:12 a.m., a second state police agent, Doug Orebaugh, went to the defendant's house.  He posed as an investigator and told her about discovering a plot to murder her husband.  The defendant denied that anyone had come to see her that evening. She twice denied sending Gray cash in jail asking, "where would I get $450?"  After Orebaugh told her police found evidence in Gray's cell that she had sent him $450, the defendant admitted sending that amount but claimed Gray needed it to pay taxes and rent.  Asked if she would advise the police if she learned of a plot to kill Martin, she responded, "oh, God, yes."

The evidence supports the trial court's finding that the Commonwealth proved a prima facie case of conspiracy independent of the out-of-court statements of the co-conspirator, Butch Gray.  Gray thought he hired someone to kill Martin and sent $500 as advance payment.  Evidence linked the defendant to Gray's actions in hiring the assassin.  The defendant sent Gray $450 cash right before he sent the $450 payment.  The defendant sent Gray love letters in jail and received hundreds of telephone calls from him after he was convicted of conspiracy to

-

murder her husband. Many of the calls to the defendant's home coincided with Gray's calls to the hired killer.

The defendant acknowledged only a two-day relationship with Gray and claimed she fell in love with him after he was arrested in February 1998. Recorded conversations between them showed intimate relations in 1997. The defendant and Gray talked about the gun and silencer. During one of the many recordings of conversations between Gray and the defendant, she said, "I want to hear that bullet hit. Yee ha." Then Gray explained that you do not want to do it too fast because there should be "a lot of pain and suffering."

The defendant denied that anyone had visited her the night the agent posed as a hired killer. She did not call the police or Martin about the plot, even though she later proclaimed she would. The defendant denied owning any guns but then admitted Gray had given her two. The silencer found in Gray's residence fit both guns.

Excluding the out-of-court statements by the co-conspirator, the evidence and the reasonable inferences arising from it established the conspiracy to murder by a preponderance of the evidence. "'A common purpose and plan may be inferred from a collocation of circumstances.'" Amato v. Commonwealth, 3 Va. App. 544, 552, 352 S.E.2d 4, 9 (1987) (citation omitted). The Commonwealth may prove the existence of the conspiracy through circumstantial evidence and need not

-

prove an explicit agreement.  See Stevens v. Commonwealth, 14
Va. App. 238, 241, 415 S.E.2d 881, 883 (1992); Harris v. United
States, 433 F.2d 333, 335 (4th Cir. 1970) ("The existence of an
unlawful and inherently covert agreement can be inferred from
the overt conduct of the parties.").

Some of the evidence that supported the finding of a
prima facie case of conspiracy was admitted after the trial
court ruled.  Nonetheless, that evidence can be considered in
evaluating whether the evidence supported such a finding.  "The
order of presentation of evidence . . . is usually a matter left
to the discretion of the trial court and, absent an abuse of
discretion, will not be disturbed" on appeal.  Floyd v.
Commonwealth, 219 Va. 575, 582, 249 S.E.2d 171, 175 (1978).  The
trial court did not err in permitting the jury to consider
Gray's extensive statements implicating the defendant.

When a defendant challenges the sufficiency of the
evidence, we examine the evidence that tends to support the
conviction and allow it to stand unless it is plainly wrong or
unsupported by the evidence.  Where the evidence supports the
conviction, "an appellate court is not permitted to substitute
its own judgment for that of the fact-finder, even if the
appellate court might have reached a different conclusion."
Commonwealth v. Presley, 256 Va. 465, 466, 507 S.E.2d 72, 72
(1998) (citations omitted).  We also view the evidence and all

-

reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth.  See id.

Gray showed Martin a rifle with a silencer and said, "this was made for you."  Gray said that the defendant wanted Martin killed and had ordered the plans for the silencer so that Gray could build it.  He told Martin the defendant advised him to shoot Martin when he took his walk near the airport.  The defendant and a friend had been scouting Martin's habits for months.

An inmate housed in Gray's cellblock testified that each time Gray spoke with the hired killer, he would call someone whom Gray identified as the defendant.  On August 18, after speaking with "Jack Brisco," Gray called the defendant, and the inmate overheard him tell her the money arrived and her "divorce problems were going to be taken care of."  He overheard Gray tell someone that "they were going to kill James Martin and make it look like an accident."  Gray told the inmate that he was going to receive $450 from the Fincastle post office.  The next day, the money arrived with a handwritten note from the defendant.

Gray told the police that he and the defendant had a plot to kill her husband using a "silencer."  Recorded conversations revealed discussions between the defendant and Gray about the gun and silencer.  Gray told the defendant that if she wanted

-

someone to "set up" Martin, he would find someone to do it.  She responded, "I know."

The defendant's explanation for incriminating evidence against her was questionable.  When drawing reasonable inferences from the facts, the fact finder "was entitled to weigh the defendant's contradictory statements," Toler v. Commonwealth, 188 Va. 774, 781, 51 S.E.2d 210, 213 (1949), and to infer that she was attempting to conceal her guilt.  See Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998).

When the evidence of the co-conspirator's out-of-court statements is added to the other evidence of the conspiracy, it was sufficient to prove beyond a reasonable doubt that the defendant conspired to murder James Martin.  Accordingly, we affirm the conviction.

Affirmed.

Benton, J., dissenting.

The evidence at trial proved that Dorothea Chisom Martin and her husband endured several separations during their marriage until Martin's husband left their marital home in 1995. Martin filed for a divorce in November 1995, a month after her husband last left their home. A year later, Martin met Thomas Gray and began a relationship with him. In 1998, Gray was indicted and convicted by a jury of conspiracy to murder Martin's husband. After Gray's conviction and while he was in the county jail, the grand jury indicted Martin and Gray for conspiracy to commit capital murder of Martin's husband in violation of Code § 18.2-31. Although the indictment does not specify the precise violation of Code § 18.2-31, the jury instructions and verdict pertain to "murder for hire" a violation of Code § 18.2-31(2).

At Martin's jury trial, the prosecutor called Gray as the Commonwealth's witness. Gray, however, invoked his Fifth Amendment right not to testify. Later, during the presentation of the Commonwealth's evidence, the prosecutor sought to offer hearsay statements made by Gray, whom the Commonwealth alleged to be Martin's co-conspirator. Martin's counsel objected that a proper foundation did not exist.

> "The general rule is that . . . a prima facie case of conspiracy [must be established] before the declarations of a co-conspirator, made out of the defendant's presence, may be admitted into evidence."

-

"Otherwise hearsay would lift itself by its own bootstraps to the level of competent evidence."

<u>Poole v. Commonwealth</u>, 7 Va. App. 510, 513, 375 S.E.2d 371, 373 (1988) (citations omitted).

The trial judge initially denied the prosecutor's motion to use Gray's hearsay statements. He thoroughly analyzed the evidence as follows:

> [JUDGE]: All right. These things are established, Number One, Mr. Gray apparently wants [Martin's husband] dead, but we already knew that. We had a Jury that told us so.
>
> Mr. Gray called Mrs. Martin numerous times. I also note that in these 19 letters, all of which I have not read, but I read the majority of them, she writes to him to stop calling here, particularly at work.
>
> The question of the denial to Mike Bass posing as Jack Brisco could -- as I understood the evidence, he goes to the door and says, "Butch sent me and you are to give me a gun or give me $300 to buy a gun."
>
> The evidence that I have of what was going on with Mr. Gray was whoever was going to do this was going to use [Martin's husband's] own gun to make it appear to be a suicide.
>
> Her denial then amounts to one of two things. One, she knew that was not part of the plan and she was not going to buy into it; or she really did not know what was going on.
>
> Let's look at the money. She sent $450 and she sent it with a letter, the envelope which was postmarked the 12th and it got here on the 13th.

-

The letter said, "Hi Sport, hope this helps.  It is what you asked for.  Let me know if you get it.  Call work and say that you got it so that I will be at ease.  Would you do the same for me?"

Well, pretty broad phrasing in there.  Look at that the background of that.

The letter of August 5th, it is a long rambling letter, but in the middle of the page she writes, "I got the bills today.  I wish that you would tell me what you expect of me.  I feel responsible for you being in there, so I should help with the outside work.  I'm here for you, you know that I will do what I can."

Then she talks about having to space out her checks for a month and she rambles on then for a considerable length.

At the bottom of the third page she says, "take care, my love, and try to stay out of trouble and be a good boy, don't start anything.  I love you and Buff wants out."  She is talking about the cat wanting to go out.

Throughout the letters there is an emotional affection on her part toward Mr. Gray.  Mr. Gray is hardly in a position to reciprocate it by this time.

On August 10th, the letter to [Martin's attorney] had referenced to, "As I told you on the phone several times, let me know what you want me to do."

If I had that statement by itself that sounds interesting, but the paragraph goes on.  "I do intend to get another job with the Postal Service until 2001, but shit happens.  If you don't have a place to go, well, yes, you will, but if you don't think you will, you will always have one with me if I save my money, unless you want me to keep you from bankruptcy and I can get a down payment on us a nice home, both boys will be welcome."

-

Now, with Special Agent Orebaugh, I'm persuaded that he is reasonably well known to [Martin] from the previous trial.

My recollection is that he at least interrogated her -- I do not remember the details, but he comes at one o'clock in the morning and she gives him what is clearly a false answer.

I don't condone that, but I do not know what significance to attach to it.

She is either lying to cover up a conspiracy, she is lying to cover up that she is having contact with Gray or she is lying because she just does not want to cooperate with Investigator Orebaugh because they were down that road once before.

She lies about sending him money, she says something about $20 later, but then she does admit it and she says that it is for the payment of rent and taxes. That is the way that it came down for the Investigator.

The letter says, "I hope this helps. It is what you asked for." And we have in two prior letters talking about the bills that came in. She talks about maintaining his credit.

[PROSECUTOR]: In the August 10th letter she talks about paying the bills that he sends her and that is always what is it.

It is not her sending money to him. It is him sending the bills to her.

Mr. Fulcher testified that they do not have checkbooks in jail.

[JUDGE]: I understand that.

[DEFENSE COUNSEL]: You can send the money somewhere else.

[PROSECUTOR]: He sent her the bills and she pay them. That is throughout the letters.

-

[JUDGE]:  She says in that paragraph and I will get it back out if I need to, she says, "I got the bills today" and then "tell me what you want to do.  I need to space my checks out for a month."

Now, one can infer from that that she is paying the bills, but I don't know.

The bottom line is this evidence is in equal balance at this point.  I cannot say that a prima facie case is made out, but I cannot say that it is totally void, either, but the burden is on your side, Mr. [prosecutor].

The ball is not over the fifty yard line, the scales are not tipped one way or the other, use whatever metapho[r] that you want to use.  Do you have other evidence to present?

During the testimony of Martin's husband, the trial judge reconsidered his ruling and granted the prosecutor's motion. Nothing in Martin's husband's testimony, however, tended to prove Martin was engaged in a conspiracy to commit murder for hire.  The trial judge's initial analysis of the evidence accurately reflected the state of the relevant evidence and the prosecutor's failure to prove a prima facie case of conspiracy.

For these reasons, I would hold that the trial judge erred in admitting the hearsay statements.  Accordingly, I dissent.