COURT OF APPEALS OF VIRGINIA


Present:  Judges Frank, McClanahan and Haley
Argued at Richmond, Virginia


JASON RAMON JORDAN
                                                    MEMORANDUM OPINION* BY
v.        Record No. 1026-07-3          JUDGE ELIZABETH A. McCLANAHAN
                                                        SEPTEMBER 9, 2008
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
                          Joseph W. Milam, Jr., Judge

            Stacie A. Cass, Assistant Appellate Defender (Office of Appellate
            Defender, on briefs), for appellant.

            Kathleen B. Martin, Senior Assistant Attorney General (Robert F.
            McDonnell, Attorney General, on brief), for appellee.


      A jury convicted Jason Ramon Jordan of first-degree murder, in violation of Code

§ 18.2-32.  On appeal, Jordan argues the evidence was insufficient to support his conviction.  For

the following reasons, we affirm the conviction.

                                I.  BACKGROUND

      On appeal, we review the evidence in the "light most favorable" to the Commonwealth.

Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003) (citations omitted).

That principle requires us to "discard the evidence of the accused in conflict with that of the

Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and

all fair inferences that may be drawn therefrom."  Kelly v. Commonwealth, 41 Va. App. 250,

254, 584 S.E.2d 444, 446 (2003) (*en banc*) (internal quotation marks and citations omitted).

---

      * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

The victim, 19-year-old Latrella Bates, attended a party at the apartment of Kevin Mason, in Danville, on the evening of July 14, 2005. Jordan also attended the party. Bates was last seen alive when leaving the party with Jordan late that night. A week later, her badly decomposed body was found in a wooded area located near the apartment complex.

Jordan arrived in Danville by bus three days before the party, and was residing with Patricia Barksdale at her apartment across the hall from Mason. After being introduced to Jordan, Mason invited Jordan to join him and some of his friends, including Bates, for the party at Mason's apartment. Most of Mason's guests, including Bates and Jordan, attended the party for several hours. One of the guests, Latisha Townes, testified at trial that, while at the party, she heard Jordan ask Bates to have sex with him and Bates refused. Another guest, Stacy Terry, testified that Bates told her she did not like Jordan or the way he was acting toward her that evening. Mason, who considered Bates "like a little sister" and looked after her because she was "a little bit slow," testified that he told Jordan to leave Bates alone when Jordan tried to flirt with her, but Jordan just "laughed it off."

Around 12:30 a.m., Bates indicated she was ready to leave the party, and Jordan volunteered to walk her to her sister's house. At least three of Bates' friends cautioned her against leaving with Jordan because he was a stranger whom they all had just met. Mason suggested that she spend the night at his apartment instead. Bates and Jordan went outside for a few minutes, returned to the apartment, and then left together around 1:00 a.m.

At that time, Bates was wearing blue capri pants, a black tank top with thin straps, and clear "flip-flops" with a flower or bow on the toe. She weighed between 90 and 100 pounds and was 5 feet 2 inches tall. Although she had short hair, she was wearing a hairpiece to make her hair look longer, and had it fixed in a ponytail. Jordan was wearing a white t-shirt and blue or black jeans. He was 21 years old and weighed approximately 180 pounds.

Between 2:30 and 3:00 a.m.—an hour and a half to two hours after Bates and Jordan left the party—Townes saw Jordan going up the steps to Barksdale's apartment. Townes stated Jordan was "sweaty and out of breath," and had "a strange look on his face." When he reached Barkdale's apartment, Jordan "banged" on the front door until her 13-year-old son, Cortez, awoke and let him in. As Cortez testified, Jordan, who was shirtless and sweating, walked in and sat down on the couch, without speaking to Cortez. Jordan also appeared "worried" and "angry." Cortez then went back to bed, and when he got up around 8:00 or 9:00 a.m., Jordan was not in the apartment.

Around 8:30 a.m., Jordan appeared at the apartment complex office, where he met two of the property managers. Indicating he was deaf, Jordan started communicating with them by sign language. After the managers indicated they could not communicate in that manner, Jordan began writing them notes. Jordan represented that his name was "Derrick Johnson" and that he was 17 years old. He explained he came to Danville to meet his brother at Barksdale's, but his brother had already left, and he needed to return home to Mississippi. He claimed Barksdale had been mean to him, and he was scared. When asked for identification, he indicated Barksdale or her children stole it. The managers tried unsuccessfully to contact Jordan's family by telephone, using the numbers Jordan gave them. One of the managers then called the Danville Department of Social Services (DSS), explained the circumstances, and was advised that DSS would purchase a bus ticket to Mississippi for this alleged deaf juvenile. The manager also called the Danville Police Department for purposes of transporting him to DSS.

Two police officers subsequently arrived at the apartment complex office, and met with Jordan. As one of the officers testified, based on Jordan's representations, they believed him to be a stranded, deaf juvenile from Mississippi, named "Derrick Johnson," who "needed some help." After running an NCIC check on Jordan under his fictitious name, the officers took him

back to Barksdale's apartment to retrieve his clothing, bought him lunch, and delivered him to DSS.

Continuing to appear deaf, Jordan represented in writing to DSS employees that his name was "Derrick Jordan," and he signed a voucher for a bus ticket by that name. He was also given twenty dollars for expenses. A DSS employee then took Jordan to the bus station about 4:30 p.m. and purchased his ticket for him.

Ramona Oliver was on duty at the bus station when Jordan arrived. After being apprised of the circumstances, Oliver issued a ticket to Greenville, Mississippi for "Derrick Jordan," and wrote on the ticket folder, for the benefit of the bus driver, that Jordan was deaf. When Oliver's shift ended around 6:00 p.m., she told her replacement, Ivy Edwards, there was a deaf person in the lobby waiting to take a bus to Mississippi.

Shortly thereafter, Edwards saw Jordan in the lobby. She immediately recognized him as the person who had arrived on a bus four days earlier, and had asked to use the telephone to call someone to pick him up; so she knew he was not deaf. Edwards confronted Jordan and asked him why Oliver thought he was deaf, to which Jordan simply "shrug[ged]." Edwards called Oliver, and put Jordan on the telephone to explain his behavior to her. Jordan told Oliver he "didn't know why" people thought he was deaf, but that he was "just going along with it." Jordan then left on the bus to Mississippi at 8:10 p.m. that evening, Friday, July 15, 2005.

Bates' mother reported her missing on Sunday, July 17, 2005. The police conducted a search around the apartment complex where Bates' friends last saw her alive. A white t-shirt was found behind a building across the road from the apartments. The shirt was dirty but had no blood on it.

On Friday, July 22, 2005, a worker discovered a badly decomposed body when trimming around a wooded area at the rear of a parking lot of a church in Danville. The body was lying

face down on the ground with arms outstretched, about five to six feet into the woods, where the undergrowth around the trees was thick. The body was nude, except for a small black tank top that was rolled up most of the way on the upper part of the torso. DNA analysis identified the body as Bates. The location of her body was midway between Mason's apartment and her sister's house, about five blocks from each.

The police determined from the crime scene investigation that Bates had been dragged facedown by the feet or torso into the wooded area where her body was found. The area was thickly covered with pine needles, except for a nine feet long section containing drag marks, where there was "nothing but dirt."

Upon further investigation, Detective Jerry Pace recovered a hairpiece just outside the wooded area. While looking into a trash can at a business located nearby, Pace also found a pair of size 3 denim capri pants and a pair of size 7-8 clear flip-flops. The manager of the business told Pace that he had found the pants and shoes lying under a tree on the property two days earlier and put them in the trash can. Detective Jack Johnson then searched the business property further and discovered a pair of "ladies underwear" underneath a large bush.

The police subsequently learned that two men, while doing landscaping work at the business on Monday, July 18, 2005, found the clothing, the underwear, and a pocketbook under the same large bush. The men did not remove the underwear from where it was laying. However, they did remove the pants and shoes and placed them under the tree where the business manager found them. They also removed the purse, looked in it, and saw an identification card and a food stamp card with Bates' name on them. They then turned the purse over to their employer, who later discarded it.

Dr. William Massello, a forensic pathologist, with twenty-seven years of experience in the Virginia Medical Examiner's Office, conducted Bates' autopsy. As he testified at trial, she

weighed only sixty pounds because of weight lost during postmortem decomposition. He determined her death occurred several days before she was found, due to the nature of the infestation in her body. The extremely hot weather following her death accelerated the decomposition process. The skin and anterior wall of the abdomen and chest were absent. The internal organs, vagina, and soft tissue around the face were also gone. The skull remained with a remnant of hair and ear.

Dr. Massello found no broken bones, bullet holes or stab marks. He ruled out death by disease because Bates had no known health problems. While he was not able to determine a specific cause of death, Dr. Massello concluded from the totality of the circumstances surrounding the location and condition of the body that Bates' death was a homicide. He also nevertheless opined that the "most likely cause of death" was an "asphyxial mechanism," that is, some means of preventing one from breathing such as smothering or strangulation. This, he explained, was the most common type of violent death not likely to leave any marks on the victim.

Detective Pace located Jordan in Sumpter County, Georgia, where he was in custody on charges from that jurisdiction. On August 31, 2005, Pace, along with Detective Johnson, interviewed Jordan at the Sumpter County jail. The interview was video recorded, and the recording was played for the jury at trial.

During the interview, Jordan claimed he arrived in Danville on Thursday, July 14, 2005, and left the next day. He admitted he had been to Mason's apartment on July 14 during the time of the party, but stated he was there for only 10 to 15 minutes—just long enough to smoke a cigarette. He claimed he then returned to Barksdale's apartment and stayed there all night. He stated that he remembered seeing only one female at the party, who did not meet Bates' description. When shown Bates' picture, Jordan denied any knowledge of her. He then

- 6 -

specifically denied meeting Bates at Mason's apartment and volunteering to walk Bates to her sister's house. He also denied leaving the party with her and then having sex with her. After the officers advised Jordan that they were investigating Bates' death, as a homicide case, and that he was a suspect, Jordan became agitated and ended the interview.

The detectives then obtained a search warrant to take a DNA sample from Jordan. After Jordan's initial refusal to cooperate, the detectives were able to get the sample from him, and delivered it to the Virginia Department of Forensic Science (VDFS) for analysis.

Nicole Harold, a forensic scientist with VDFS, determined the DNA profiles of both Bates and Jordan from the DNA samples from each of them. Harold also conducted DNA analysis of the underwear recovered during the police investigation. First, she identified seminal fluid from a stain in the crotch area, "which means [she] basically identified spermato-cell or the male reproductive cell." This sample, as she testified, is referred to as the sperm fraction. Second, she identified other cells from the same area, all of which are referred to as the non-sperm fraction.

Harold concluded that the DNA profile from the non-sperm fraction on the underwear was consistent with a mixture of DNA from both Jordan and Bates. She also concluded that the sperm fraction DNA profile was consistent with Jordan's DNA. That is, he "could not be eliminated" from the profile. Furthermore, Harold testified, the probability of selecting another individual with a DNA profile matching that of Jordan's sperm fraction was greater than one in six billion. That particular profile would be expected to occur "once in the population of the world."

Finally, another VDFS forensic scientist testified she conducted a DNA analysis on the capri pants recovered by the police, and identified a mixture with a DNA profile indicating it was contributed by both Bates and Jordan.

Jordan moved to strike the Commonwealth's evidence, and the trial court denied his motion. He presented no evidence and renewed his motion to strike. The court again denied the motion. The jury then convicted Jordan of first-degree murder.

## II. ANALYSIS

When sufficiency of the evidence supporting a jury's decision is challenged on appeal, as here, Code § 8.01-680 requires that we review the decision "to see if reasonable jurors could have made the choices that the jury did make. We let the decision stand unless we conclude no rational juror could have reached that decision." Pease v. Commonwealth, 39 Va. App. 342, 355, 573 S.E.2d 272, 278 (2002) (*en banc*), aff'd, 266 Va. 397, 588 S.E.2d 149 (2003). In other words, this Court does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (emphasis in original). Rather, "the relevant question is whether . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original). See Seaton v. Commonwealth, 42 Va. App. 739, 746-48, 595 S.E.2d 9, 12-13 (2004).

"'This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" Kelly, 41 Va. App. at 257-58, 584 S.E.2d at 447 (quoting Jackson, 443 U.S. at 319). Likewise, it "ensures that we remain faithful to our duty 'not to substitute our judgment for that of the trier of fact, even were our opinion to differ.'" Seaton, 42 Va. App. at 747-48, 595 S.E.2d at 13 (quoting Crowder v. Commonwealth, 41 Va. App. 658, 663 n.1, 588 S.E.2d 384, 387 n.1 (2003)).

In challenging the sufficiency of the Commonwealth's evidence in this case, Jordan argues in the alternative: (i) that the evidence failed to prove Bates died of a criminal act, i.e., murder, rather than by accident or natural causes, (ii) that even if this Court finds the

Commonwealth proved Bates died as a result of such criminal act, the evidence was insufficient to prove Jordan committed the act, and (iii) that even if we conclude the Commonwealth proved Jordan killed Bates, the evidence did not prove he did so willfully and with premeditation and deliberation, as required for a conviction of first-degree murder. We reject each of these contentions.

## A. Evidence of *Corpus Delicti*

The Commonwealth must prove the *corpus delicti* in the prosecution of every homicide case, consisting of proof that "the victim's death resulted from the criminal agency of the defendant." Commonwealth v. Presley, 256 Va. 465, 470, 507 S.E.2d 72, 74 (1998) (citing Opanowich v. Commonwealth, 196 Va. 342, 355, 83 S.E.2d 432, 439-40 (1954)). See Bowie v. Commonwealth, 184 Va. 381, 389, 35 S.E.2d 345, 348-49 (1945) ("In murder the *corpus deliciti* has two components—death as the result, and the criminal agency of another as the means." (citation and internal quotation marks omitted)).

Our Supreme Court has long held that direct evidence is not essential to proving the *corpus delicti* in such a case; it "may be proven by circumstantial evidence," which "comes in infinite variety." Epperly v. Commonwealth, 224 Va. 214, 228-29, 294 S.E.2d 882, 890-91 (1982). See Bowie, 184 Va. at 390, 35 S.E.2d at 349; Cochran v. Commonwealth, 122 Va. 801, 817, 94 S.E. 329, 333 (1917). Indeed, as the Supreme Court recently stated in Muhammad v. Commonwealth, 269 Va. 451, 479, 619 S.E.2d 16, 31 (2005), "[t]here is no distinction in the law between the weight or value to be given to either direct or circumstantial evidence." As to the latter, it is "not viewed in isolation. While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion." Id. at 479, 619 S.E.2d at 32 (citation omitted).

### (i) Proof that Bates' Death was by Criminal Act

As in the instant case, "[a]n examination of the body of a dead person will not always disclose whether death was from natural causes or by means of violence." Bowie, 184 Va. at 390, 35 S.E.2d at 349. However, consistent with the above-stated principles, "[a]n investigation of the cause of death is . . . not limited to the mere appearance of the body. The circumstances surrounding the cause of death may be inquired into." Id.; see Epperly, 224 Va. at 229-30, 294 S.E.2d at 891 (defendant convicted of first-degree murder based on circumstantial evidence where the victim's body was never found); Aldridge v. Commonwealth, 44 Va. App. 618, 651-52, 606 S.E.2d 539, 555-56 (2004) (determination that cause of baby's death was drowning required examination of all the circumstances in the case, not just the body).

Because of the advanced decomposition of Bates' body when found, the forensic pathologist, Dr. Massello, was unable to determine the specific cause of death, though he thought it "likely" she died by some means of asphyxiation. Dr. Massello ruled out death by disease because Bates had no known health problems. This opinion must be viewed in combination with other relevant circumstances supporting the jury's finding that Bates' death was a homicide. When last seen alive by her friends, Bates was on her way to her sister's house for the night, but never made it there. Seven days later, her virtually nude, decomposing body was found secluded, lying face down, in thick brush in a wooded area five blocks from her intended destination. She had been dragged by her feet or torso to that location. Her underwear, pants, shoes, and purse were found hidden under a bush a considerable distance from her body, and her underwear contained semen from a stranger she had just met before her death. What appeared to be her hairpiece was also on the ground just outside of the wooded area. Further, Jordan, with whom Bates was last seen alive, engaged in a pattern of inculpatory behavior following Bates' disappearance.

On these facts, it would be "contrary to the normal course of human affairs" to conclude that Bates' death was caused by accident or natural causes. Epperly, 224 Va. at 229, 294 S.E.2d at 891 (citation and internal quotation marks omitted). Thus, these facts "justif[ied] an inference by the jury that death was caused by a criminal agency." Id.

### (ii) Proof that Jordan was Criminal Agent

Viewed in the light most favorable to the Commonwealth, the evidence, though circumstantial, likewise supported the jury's finding that Jordan was Bates' killer. Jordan met Bates during the party at Mason's apartment, where she rejected his request to have sex with him. Jordan nevertheless convinced Bates, who was described mentally as "a little bit slow," to let him walk her to her sister's home when she was ready to leave. Bates was then last seen alive leaving the party with Jordan around 1:00 a.m. While with Bates, Jordan engaged in sexual activity with her, as evidenced by his semen on her underwear and traces of his DNA on her pants—articles of clothing that were later found hidden under a bush in the vicinity of her secluded, decomposing body. An hour and a half to two hours after leaving the party with Bates, Jordan, returning alone to Barksdale's apartment, was shirtless, sweaty, out of breath, and looking "strange," "worried," and "angry." Jordan also failed to even speak to Barksdale's 13-year old son, Cortez, when he let Jordan into the apartment between 2:30 and 3:00 a.m., after Jordan awoke him by banging on the front door.

Later that morning, Jordan lied to the apartment complex managers, police officers, DSS representatives, and bus station employees, about his name, age, and ability to hear and speak—pretending to be a deaf juvenile, and using two different false names—all in an effort to conceal his identify and gain transportation out of Virginia on the same day. See Lovitt v. Commonwealth, 260 Va. 497, 512, 537 S.E.2d 866, 876 (2000) ("Flight by a defendant after the commission of a crime is probative evidence of guilt of that crime."). In addition to obtaining a

bus ticket to Mississippi through manipulation and misrepresentations, Jordan also caused the police to use the wrong name when running an NCIC check on him before driving him to DSS. See Edmondson v. Commonwealth, 248 Va. 388, 390-91, 448 S.E.2d 635, 637 (1994) (use of false name constitutes flight).

When the police subsequently interviewed Jordan about Bates' death, Jordan again lied, when he indicated he was at Mason's party less than 15 minutes, and denied that he even saw or met Bates at the party. He also specifically denied leaving the party with her and later having sex with her, claiming, instead, that he returned to Barksdale's apartment after a short time at the party and stayed in her apartment for the rest of the night.

Having rejected Jordan's attempted explanations as untrue, the jury was entitled to infer that Jordan was "lying to 'conceal his guilt,' Haskins v. Commonwealth, 44 Va. App. 1, 10, 602 S.E.2d 402, 406 (2004), and could treat such prevarications as 'affirmative evidence of guilt,' Wright v. West, 505 U.S. 277, 296, 112 S. Ct. 2482, 120 L. Ed. 2d 225 (1992)." Coleman v. Commonwealth, 52 Va. App. 19, 25, 660 S.E.2d 687, 690 (2008); see Covil v. Commonwealth, 268 Va. 692, 696, 604 S.E.2d 79, 82 (2004) ("A false or evasive account is a circumstance, similar to flight from a crime scene, that a fact-finder may properly consider as evidence of guilty knowledge.").

### B. Evidence of Premeditation

Code § 18.2-32 provides, in relevant part, that "[m]urder . . . by willful, deliberate, and premeditated killing . . . is murder of the first degree . . . ."[1] "'To premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second degree murder.'" Kirby v.

---

[1] While malicious intent is an element of both first and second degree murder, Baker v. Commonwealth, 218 Va. 193, 195, 237 S.E.2d 88, 89 (1977), "'[m]alice is implied by law from any willful, deliberate and cruel act against another, however sudden,'" Aldridge, 44 Va. App. at 658, 606 S.E.2d at 559 (quoting Epperly, 224 Va. at 231, 294 S.E.2d at 892).

Commonwealth, 50 Va. App. 691, 700, 653 S.E.2d 600, 604 (2007) (quoting Remington v. Commonwealth, 262 Va. 333, 352, 551 S.E.2d 620, 632 (2001); Aldridge, 44 Va. App. at 655, 606 S.E.2d at 557). Such intent "'need not exist for any specified length of time prior to the actual killing; the design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill.'" Remington, 262 Va. at 352, 551 S.E.2d at 632 (quoting Weeks v. Commonwealth, 248 Va. 460, 477, 450 S.E.2d 379, 390 (1994)); see Epperly, 224 Va. at 231, 294 S.E.2d at 892 ("It is the will and purpose to kill, not necessarily the interval of time, which determine the grade of the offense." (citation and internal quotation marks omitted)).

The question of whether the defendant committed a willful, deliberate, and premeditated killing of the victim, "so as to elevate a homicide to first degree murder, is in the province of the jury." Epperly, 224 Va. at 232, 294 S.E.2d at 892 (citing Hodges v. Commonwealth, 213 Va. 316, 191 S.E.2d 794 (1972)). Furthermore, "'[p]remeditation and formation of an intent to kill seldom can be proved by direct evidence. A combination of circumstantial factors may be sufficient.'" Pender v. Angelone, Director, Virginia Dept. of Corrections, 257 Va. 501, 508, 514 S.E.2d 756, 759 (1999) (quoting Rhodes v. Commonwealth, 238 Va. 480, 486, 384 S.E.2d 95, 98 (1989) (citing Epperly, 224 Va. at 232, 294 S.E.2d at 892-93)); see Edmonds v. Commonwealth, 229 Va. 303, 308, 329 S.E.2d 807, 811 (1985) ("[A]bsent eyewitness testimony or a voluntary confession, that question [of whether a killing was premeditated] necessarily turns upon the import of circumstantial evidence." (citing Epperly, 224 Va. at 232, 294 S.E.2d at 892-93)).

The Supreme Court has identified five circumstances that the fact finder may consider in deciding whether the evidence is sufficient to prove premeditated murder: (1) the brutality of an attack; (2) the disparity in size and strength between the accused and the victim; (3) the concealment of the victim's body; (4) the defendant's lack of remorse; and (5) defendant's

efforts to avoid detection.  Epperly, 224 Va. at 232, 294 S.E.2d at 892.  The existence of each of these circumstances is not required for the application of this rule.  Rhodes, 238 Va. at 487, 384 S.E.2d at 99.  Indeed, "any one of these circumstances standing alone might [be] sufficient" in a particular case.  Kirby, 50 Va. App. at 702, 653 S.E.2d at 605.

Here, we are presented with evidence of four of the five circumstances identified in Epperly, the combination of which established ample proof of Jordan's specific intent to kill the victim.[2]  Bates weighed between 90 and 100 pounds; Jordan weighed around 180 pounds.  Jordan effectively concealed Bates' body in a secluded wooded area.  On the day following her death, Jordan showed no remorse.  Instead, he spent the day in furtherance of his scheme to avoid detection, while seeking to obtain transportation out of Virginia.  This included his lying to numerous individuals, including the police, regarding his name, age, and ability to hear and speak.

## III.  CONCLUSION

Based on the totality of the circumstances, we conclude the evidence was sufficient for the jury to rationally find Jordan guilty of premeditated murder.  Accordingly, we affirm his conviction.

                                                                                                  Affirmed.

---

[2] Because of the advanced decomposition of Bates' body, the specific details of Jordan's attack upon her could not be established.