COURT OF APPEALS OF VIRGINIA


Present:   Judges Frank, Beales and Powell
Argued at Richmond, Virginia


ANTONIO QUAN DIAZ

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 2377-09-2                    JUDGE CLEO E. POWELL
                                                         OCTOBER 26, 2010

COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                           Beverly W. Snukals, Judge[1]

            Catherine French, Supervising Assistant Public Defender (Office
            of the Public Defender, on brief), for appellant.

            Jennifer C. Williamson, Assistant Attorney General (Kenneth T.
            Cuccinelli, II, Attorney General, on brief), for appellee.


        Antonio Quan Diaz ("Diaz") was convicted of robbery, in violation of Code § 18.2-58,

abduction, in violation of Code § 18.2-47(A), and malicious wounding, in violation of Code

§ 18.2-51.  On appeal, Diaz argues that the trial court erred in denying his motion to suppress

because the officer seized him without first having a reasonable, articulable suspicion that he was

the perpetrator of the attack.  He also argues that the evidence was insufficient to prove that he

was the perpetrator.  For the reasons that follow, we disagree with Diaz's arguments and affirm

his convictions.

---

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

        [1] Thomas N. Nance, Judge Designate, presided over the hearing on Diaz's motion to
suppress.

## I. BACKGROUND

Ernest Johnson was responsible for opening the laundromats at the apartment complex where he resided every weekend morning and closing them every weekend evening. On December 29, 2008, between 7:30 and 7:45 p.m., Demetrius Wright, who lived above one of the laundromats, saw Johnson leave his apartment, locking the door as he did so, and walk across the parking lot to a laundromat. Prior to observing this, Wright had consumed two twenty-four ounce Natural Light beers.

Johnson went to the laundromat by himself and, after verifying that there were no clothes in any washers or dryers, checked the empty room that adjoins the laundry facility. As he turned the light on, someone hit him on his head. As he was tussling with his attacker, he fell to the floor of the laundromat and blacked out.[2] Johnson later remembered waking up and realizing that his ankles were bound with plastic ties. At no time did Johnson see his attacker.

Shortly after Johnson entered the laundromat, Wright heard "a thump sound, like a commotion, and . . . the door slam." Confused about why Johnson would close the door while still inside, Wright went downstairs to investigate. Wright knocked on the locked laundromat door, and a man later identified as Diaz opened it "[j]ust enough for [Wright] to see his face and his head." Wright noticed that Diaz was wearing a white, puffy coat. Wright also saw Johnson's bound feet sticking out from behind a dryer. Wright asked Diaz where Johnson was, and Diaz told him that Johnson was in back. Wright asked Diaz to tell Johnson that he would see him later and walked a short distance away to call the police.

Wright then saw Diaz leave the laundromat and enter Johnson's apartment building. Wright was standing outside the building when Diaz began to exit. Upon seeing Wright, Diaz

---

[2] During the attack, Johnson suffered a shattered elbow and blood on his brain.

turned and reentered the building. At about the same time, Wright heard the police approaching. Diaz then exited the building, jumped over a fence, and ran away.

At approximately 7:56 p.m., Officer Jason Leslie of the Richmond Police Department responded to a police dispatch for a "person down" inside a laundromat and when he arrived, he encountered Wright. Wright told Officer Leslie that his friend inside the laundromat was very badly hurt and that the person who had assaulted his friend had just run off toward the front of the apartment complex and an adjacent street. Officer Leslie broadcast a description of the suspect provided by Wright over the radio to other officers responding to the scene.

Detective Amira Slen was approximately two minutes away from the scene in an unmarked police vehicle when she heard the radio report that a person had been assaulted and that the suspect was a "black male wearing a white hoodie." While the details of the incident were still being reported, Detective Slen responded to the call. When she was en route, she spotted a group of approximately ten men standing near an intersection. While circling the block to see whether any of the men in the group met the description of the suspect, Detective Slen spotted a man, who was later identified as Diaz, in a black short sleeve t-shirt and jeans running between the houses near where the suspect was believed to have headed. The man repeatedly looked back toward the apartment complex as he ran. "When [her] headlights hit his face, . . . [she] could see the sweat glistening from his hairline down, dripping down his chin, and [she could] see the sweat glistening down his neck." Seeing a man sweating when the temperature was around forty degrees Fahrenheit made Detective Slen suspicious.

As she approached him, Detective Slen put down her passenger window and asked Diaz whether he was okay. He assured her that he was fine. Diaz continued walking so Detective Slen remained in her car and traveled at his pace. When Detective Slen asked Diaz where he was going, he told her that he was headed home and pointed to his destination. After Diaz

passed that house, Detective Slen again asked him where he was going. This time he told her that he was headed to the store. Detective Slen then stopped her car, exited it, identified herself as a police officer, and asked to talk to him. In response, Diaz put his hands in the air. Detective Slen then asked Diaz if she could pat him down, and he consented. When she did so, she noticed that he was quivering and, based on that, she decided to handcuff him. Diaz never resisted or attempted to leave.

Approximately twenty to twenty-five minutes after Detective Slen stopped Diaz and handcuffed him, the police brought Wright to them. Although Diaz was no longer wearing a white coat, Wright identified Diaz as the man who attacked Johnson. After Wright identified Diaz, the officers searched Diaz. Nothing on his person directly connected Diaz to the robbery. However, during a search of the area near the victim's apartment, the police found the victim's keys on a path consistent with the direction in which Diaz had run.

Detective Marshall Young examined the scene and found plastic zip ties at the entrance to Johnson's apartment building and inside the laundromat. When the police searched Johnson's apartment, they found only a few dollars on the coffee table. Johnson stated that when he left to walk to the laundromat, he had $1,600 in cash in his apartment.

Detective Young subsequently interrogated Diaz. Diaz told Detective Young that he was walking to get more beer when he encountered Detective Slen. As an explanation as to why he had no money with which to buy beer, Diaz stated that he must have lost his beer money when he fell and cut his hands on some glass on the street.

## II. ANALYSIS

### A. Whether the Trial Court erred in Denying Diaz's Motion to Suppress

Diaz initially contends that the trial court erred in denying his motion to suppress because Detective Slen seized him without reasonable, articulable suspicion.

- 4 -

> "In reviewing the denial of a motion to suppress evidence claiming a violation of a person's Fourth Amendment rights, we consider the facts in the light most favorable to the Commonwealth, the prevailing party at trial. The burden is on the defendant to show that the trial court committed reversible error. We are bound by the trial court's factual findings unless those findings are plainly wrong or unsupported by the evidence. We will review the trial court's application of the law de novo."

Whitehead v. Commonwealth, 278 Va. 300, 306-07, 683 S.E.2d 299, 301 (2009) (quoting

Malbrough v. Commonwealth, 275 Va. 163, 168-69, 655 S.E.2d 1, 3 (2008)).

> "Two types of seizures of the person are protected by the Fourth Amendment - an arrest and an investigatory stop. A police officer may seize a person by arrest only when the officer has probable cause to believe that the person seized has committed or is committing a crime. In order to justify the brief seizure of a person by an investigatory stop, a police officer need not have probable cause; however, he must have 'a reasonable suspicion, based on objective facts, that the [person] is involved in criminal activity.' In determining whether a police officer had a particularized and objective basis for suspecting that the person stopped may be involved in criminal activity, a court must consider the totality of the circumstances."

Whitaker v. Commonwealth, 279 Va. 268, 274, 687 S.E.2d 733, 736 (2010) (quoting Ewell v.

Commonwealth, 254 Va. 214, 216-17, 491 S.E.2d 721, 722-23 (1997)).

Reasonable suspicion requires that an officer "be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity" by the suspect. Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000). Although it is true that "'[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime[,]'" a trial court may also consider that "'nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.'" Whitaker, 279 Va. at 275, 687 S.E.2d at 736 (quoting Wardlow, 528 U.S. at 124).

> If a police officer is so justified in stopping a suspect, "the officer may detain the suspect to conduct a brief investigation without violating the person's Fourth Amendment protection against unreasonable searches and seizures." McGee [v. Commonwealth],

- 5 -

25 Va. App. [193,] 202, 487 S.E.2d [259,] 263 [(1997) (en banc)]. In determining whether such justification for an investigatory stop has been established, "the courts must consider the totality of the circumstances - the whole picture." Shiflett [v. Commonwealth], 47 Va. App. [141,] 146, 622 S.E.2d [758,] 761 [(2005)] (citations and internal quotation marks omitted).

Lawson v. Commonwealth, 55 Va. App. 549, 554-55, 687 S.E.2d 94, 96-97 (2010).

Here, Detective Slen received a radio report that an assault had occurred in a specific area, and while en route to that location, she encountered Diaz. He was wearing only a t-shirt and sweating despite it only being forty degrees outside. At the time that she initially observed him, he was running and repeatedly looking back in the direction of the apartments where Johnson had just been attacked. When Detective Slen asked Diaz where he was going, he told her that he was headed home and pointed to his destination. After Diaz passed the house that he had pointed to, Detective Slen again asked him where he was going and this time he told her that he was headed to the store. Detective Slen identified herself as a police officer, and, in response, Diaz put his hands in the air. Based on this, Detective Slen had reasonable suspicion to believe that Diaz was the man who committed the assault and was justified in stopping him to question him further. That Diaz was not wearing a white coat does not negate Detective Slen's reasonable suspicion that Diaz was somehow involved in criminal activity as the trial court clearly accepted the reasonable explanation that Diaz abandoned his coat as he fled. After Wright identified Diaz as the perpetrator, she had probable cause to arrest Diaz. Therefore, his Fourth Amendment rights were not violated and the trial court did not err in denying his motion to suppress.

B. Whether the Evidence was Sufficient to Prove that Diaz was the Perpetrator

Diaz also contends that the evidence is insufficient to prove that he is the man who attacked Johnson.

Where the sufficiency of the evidence is challenged after conviction, it is our duty to consider it in the light most favorable to the Commonwealth and give it all reasonable inferences fairly

- 6 -

deducible therefrom. We should affirm the judgment unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it.

Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). "Moreover, 'if there is evidence to support the conviction, an appellate court is not permitted to substitute its own judgment for that of the finder of fact, even if the appellate court might have reached a different conclusion.'" Brown v. Commonwealth, 37 Va. App. 507, 519-20, 553 S.E.2d 415, 421 (2002) (quoting Commonwealth v. Presley, 256 Va. 465, 466, 507 S.E.2d 72, 72 (1998)).

> Furthermore, "the credibility of a witness and the inferences to be drawn from proven facts are matters solely for the fact finder's determination. In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998) (citations omitted).

Snow v. Commonwealth, 33 Va. App. 766, 774, 537 S.E.2d 6, 10 (2000).

Though the Supreme Court's decision in Neil v. Biggers, 409 U.S. 188 (1972), dealt with the admissibility of identification evidence, the factors enunciated there are relevant in determining whether identification evidence is sufficient to prove guilt beyond a reasonable doubt. Brown, 37 Va. App. at 522-23, 553 S.E.2d at 423; see also Smallwood v. Commonwealth, 14 Va. App. 527, 530, 418 S.E.2d 567, 568 (1992). These criteria include

> "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

Brown, 37 Va. App. at 523, 553 S.E.2d at 423 (quoting Townes v. Commonwealth, 234 Va. 307, 331, 362 S.E.2d 650, 663 (1987)).

Here, Wright had ample opportunity to view Diaz when Diaz was in the laundromat, when Diaz entered Johnson's building, and as Diaz exited the building. Wright also recognized

- 7 -

Diaz as someone whom he had seen in the area previously. Although Wright told the police that Diaz was wearing a white coat that Diaz was no longer wearing, Wright, immediately and without hesitation, identified Diaz as the perpetrator shortly after the attack occurred. Wright again unequivocally identified Diaz at both the preliminary hearing and the trial. See Satcher v. Commonwealth, 244 Va. 220, 250, 421 S.E.2d 821, 839 (1992) ("of the most significance on the subject of [the witness'] level of certainty . . . is the fact that her in-court identification of [the accused] was unequivocally positive"). Although Diaz argues that Wright's testimony is inherently incredible and unworthy of belief, "[t]he credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995). The circuit court, sitting as the fact finder, clearly accepted Wright's testimony. Moreover, the police apprehended Diaz in the vicinity of the crime moments after it occurred. He was wearing only a t-shirt but was sweating in the forty-degree temperature. Detective Slen observed Diaz repeatedly looking back toward the location of the crimes, and he told her conflicting stories to explain his presence on the street. Also, when stopped, Diaz had a cut on his hand consistent with an injury one would have received jumping over the fence that ran the length of the property behind the laundromat. Finally, the police found the keys to the victim's apartment on a path consistent with the direction in which Diaz had run. Thus, it cannot be said in light of the totality of the circumstances, that the fact finder was plainly wrong in finding the evidence sufficient to establish that Diaz was the perpetrator.

### III.  CONCLUSION

For the foregoing reasons, we affirm Diaz's convictions for robbery, abduction, and malicious wounding because Detective Slen had a reasonable, articulable suspicion upon which to stop Diaz and the evidence was sufficient to prove that Diaz was the perpetrator.

<u>Affirmed.</u>