UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges AtLee and Frucci
Argued by videoconference


CONTESSA EVON ARIANNA HOLLOMAN,
  SOMETIMES KNOWN AS CONTESSA
  EVONARIANNA HOLLOMAN

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 1274-24-1                      JUDGE RICHARD Y. ATLEE, JR.
                                                    MARCH 3, 2026
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
                            Matthew W. Hoffman, Judge

            Charles E. Haden for appellant.

            Elizabeth Kiernan Fitzgerald, Assistant Attorney General (Jason S.
            Miyares,[1] Attorney General, on brief), for appellee.


     Following a bench trial, a trial court convicted Contessa Holloman of possession of a

Schedule I or II substance; child abuse or neglect resulting in serious injury; child abuse or neglect

showing a wanton disregard for the health and safety of a child; and felony homicide.  On appeal,

Holloman challenges the sufficiency of the evidence to support her convictions.  For the following

reasons, we affirm the trial court's decision.

                                    I.  BACKGROUND

     "On appeal, we review the evidence in the 'light most favorable' to the Commonwealth,"

the prevailing party below.  *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc)

(quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)).

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

On May 30, 2022, Holloman called Alexandria Hudson and asked if Hudson's three-year-old daughter, A.H., could come and sleep over at Holloman's apartment for a playdate. Holloman had a seven-year-old daughter, R.H., and she was also planning to babysit another child about A.H.'s age. Holloman wanted A.H. to come and keep the other child company.[2] Hudson, who had known Holloman since they were children, agreed to let A.H. go. Around 7:00 p.m., Holloman picked up A.H. Hudson sent A.H. with a backpack, which, among other things, contained melatonin gummies to be used if A.H. had difficulty falling asleep.

Hudson had a "Facetime call," or a video call, with her daughter at 8:30 p.m. In the video, she saw A.H. sitting on the bed in Holloman's bedroom. It looked like A.H. was eating candy, and A.H. told her mom "she was having fun watching TV." Holloman was doing her own daughter's hair. Hudson also texted Holloman around 11:00 p.m. to check on A.H., and Holloman told her that A.H. was sleeping.

Around 1:00 a.m., Holloman called Hudson to ask if she could bring A.H. home. Holloman explained that she was having menstrual pain and needed to go to the hospital, and Hudson agreed she could bring A.H. home. Around 1:10 a.m., Holloman texted Hudson, "here."

Hudson, who was already outside of her house, walked towards Holloman's car. Holloman did not pull into a parking spot; she parked on the curb, and she left the car running. By the time Hudson had walked the approximately 28 feet from her porch to the curb, Holloman already had A.H. out of the car. Holloman immediately handed A.H. to Hudson, which Hudson thought was weird, and Hudson later testified that A.H. felt "heavy" and "sweaty." She asked Holloman if Holloman had given A.H. any melatonin, and Holloman responded, "one." Holloman told Hudson that A.H. was "knocked out" and she had been "snoring and drooling" in the back seat.

---

[2] The other child did not end up going to Holloman's apartment.

Hudson spoke to A.H. as she walked up to the house, but A.H. did not respond. At first, Hudson thought A.H. was sleeping, but she thought it was strange that A.H. did not respond by the time they got to the house. When they got inside, Hudson took A.H. off her shoulder to look at A.H.'s face, and A.H.'s head flopped past Hudson's hand. A.H.'s lips and skin looked "strange" and she "wasn't opening her eyes." Hudson took her to the kitchen to splash cold water on her face, but A.H. still did not respond. Hudson called 911 at 1:13 a.m., just three minutes after Holloman texted that she had arrived. Hudson performed CPR until paramedics arrived. A.H. ultimately died.

Holloman did not leave after she handed A.H. to Hudson. Instead, she had followed them into the house. After the paramedics took over A.H.'s care, Hudson asked Holloman what had happened, if A.H. had eaten anything, or if she had gotten into anything. Holloman told her that A.H. was "okay" and "fine," and she told Hudson what she had given A.H. to eat that evening.

Holloman also spoke with law enforcement officers on the scene.[3] She spoke first with Newport News Police Officer Umstead when he arrived. She told him that A.H. had been asleep and snoring in the car, and she said that A.H. had been "just fine" prior to their arrival at Hudson's. She told him that A.H. had eaten chicken fingers from Hardee's for dinner and candy from a convenience store. She did not hear any gagging or choking. She also asked Umstead where his supervisor was.

Shortly thereafter, Holloman asked a different Newport News Police officer, Officer Hartshorn, if she could leave to check on her own child because they had all eaten the same thing for dinner. When asked, Holloman told Hartshorn that R.H. was "with her father." Hartshorn

---

[3] Holloman's interactions with law enforcement were recorded on the officers' body cameras.

informed her that she was not allowed to move her car, nor was she allowed to retrieve her cellphone from the car. She also asked if she could get her stuff out of the car and go home, while leaving the car at the scene, but officers also rejected that request. Holloman went over the events of the evening again with Hartshorn.

Holloman later asked Umstead whether she could get her phone from her car to check on her own child. After speaking with a supervisor, Umstead told her she could not do so. He explained that if something happened to A.H., the car could be treated as a crime scene. Umstead then asked Holloman to go over the events of the evening again. After Holloman recounted the same events, Umstead asked her if she could think of anything else, and she told him she that she could not. She told Umstead that A.H. was "a toddler who likes to move around." She also told him that A.H. liked to pick stuff up off the floor, though Holloman did not see A.H. put anything in her mouth.

Detective Ruhlen and Detective Thornton also spoke with Holloman at Hudson's house. She gave them the same explanation of events that she had given to Hartshorn. Detective Ruhlen overheard her tell CPS that her daughter was with the child's father in Portsmouth. Holloman also told him that no one was at her apartment.

Eventually, the detectives informed Holloman that she was free to leave. But they did not permit her to take her car because they were going to get a warrant to search the car. They offered her a ride back to her apartment. Officers allowed Holloman to look for her house key in her purse, but she had to leave the purse and cellphone with law enforcement. Holloman looked through her purse, but she was unable to find her key. She told the officers that she might have left it in her door or that she might have a spare key hidden outside her home. She also asked if she could take her wallet, but officers rejected that request as well.

Officer Hartshorn transported Holloman to her apartment around 4:30 a.m. The detectives met them there. Holloman was unable to find her spare key, but she eventually realized the front door was open. She entered the home with the officers and detectives, and she told them that no one else was inside.

Holloman asked the detectives for permission to use the bathroom in her apartment and, at first, the detectives were going to agree. But Detective Ruhlen testified that Holloman appeared "evasive" and her behavior made them feel "off," so they instead offered to take her to another place, like a service station, to use the restroom. Holloman asked if she could change her clothes, but the detectives told Holloman that they were in the process of obtaining a search warrant, and she was not allowed to remove anything until after a search warrant had been executed. Though she was permitted to take a box of tampons with her as she had previously informed Hartshorn that she thought she had started her menstrual cycle. Eventually, Hartshorn transferred Holloman to another officer to take her to the restroom. Law enforcement waited outside Holloman's apartment until they were able to execute the warrant, and no one else was able to go in or out during that time.

Around 7:30 in the morning, law enforcement executed the search warrant. Officers yelled and identified themselves upon entering. They then proceeded to "clear" the apartment to make sure no one was present. Officer Hartshorn, upon entering a room with his gun drawn, discovered Holloman's daughter, R.H., on her bed underneath blankets and stuffed animals. An officer woke R.H. up, and they eventually took her outside and contacted CPS. Officers then continued with their search of the apartment.

During the search, officers collected a loose powder substance from on top of Holloman's bed. They also discovered a black plastic case with a cut straw beneath the bed. On the TV stand, behind the TV, officers discovered a corner of a plastic baggie with a white powdery

residue inside. Officers recovered a folded dollar bill with a white powder substance on it from Holloman's purse. They also found a corner of a plastic baggie filled with a white residue in the purse.

The Virginia Department of Forensic Science tested the substances. The powder from the bed contained heroin, para-fluorofetanyl, fentanyl, and Tramadol. The plastic corner bag from the TV stand contained cocaine. The substance from the dollar bill in Holloman's purse was heroin, fentanyl, and Tramadol. The plastic corner bag from the purse contained heroin, fentanyl, and cocaine.

At trial, Dr. Wendy Gunther testified that she performed toxicological testing on A.H. as part of the autopsy. The results of the test indicated that A.H. had metabolized heroin, fentanyl, and Tramadol in her system. Dr. Gunther determined that A.H. died from "acute combined heroin, fentanyl, despropionyl fentanyl,[4] and Tramadol overdose, and an additional factor was renal insufficiency." Dr. Autumn Massiello, a forensic toxicologist for the Virginia Department of Forensic Science, testified about the drugs in A.H.'s system. She noted that the concentration of each of the substances in A.H.'s system was at levels within the therapeutic range for adults.

After the Commonwealth presented its evidence, Holloman moved to strike the evidence on all four charges. On the felony child abuse charges, she argued that the evidence did not establish that her actions were willful regarding either A.H. or R.H. She argued that the Commonwealth did not establish that she was aware of the drugs in her apartment, and thus she could not know the danger to R.H. of leaving her in the apartment or that A.H. was overdosing. On the felony homicide charge, she argued that the Commonwealth failed to show that she was in the commission of felony

---

[4] Despropionyl fentanyl is a metabolite the body makes from fentanyl. It can also be a separate, illicit form of fentanyl.

- 6 -

possession of a controlled substance because they did not show she had knowing and intentional possession of a controlled substance. The trial court denied the motion to strike.

Holloman testified on her own behalf. She testified that she took the children to dinner and then they watched movies in her bedroom. When Hudson texted at 11:00 p.m., A.H. was asleep in the living room. Holloman explained that she woke up in the night feeling ill because she has gastritis, "where [her] digestive tract bleeds." She believed that A.H. was asleep when she packed up A.H. to take her home. She did not realize there was anything wrong with A.H. until Hudson laid A.H. on the floor. She explained that she left R.H. at home because she thought she was going to return home before going to the hospital. She testified that she "lied" to officers about R.H. being with her father because she "panicked."

Holloman denied using drugs that day, and she denied that she knew there were drugs in the house. She admitted, however, that she had used drugs in the home "three or four" days before A.H. died. She and some friends had been in her bedroom getting ready to go out to a club. She and her friends used cocaine and heroin in the bedroom. She denied leaving drugs behind. She also explained that the drugs in her purse were from "weeks prior." She had not used those drugs in her home.

After her testimony, she renewed her motion to strike the evidence. The trial court denied the motion. During her closing argument, she again argued that she did not know there were drugs in the apartment while the children were there.

The trial court found Holloman guilty on all four charges. As to the felony abuse or neglect charge regarding R.H., the court found that Holloman left her child alone with drugs in the home and also failed to inform anyone of R.H.'s presence after becoming aware a search warrant was going to be executed. It also found that she was aware of the presence and character of the substance that the police discovered. The court noted that Holloman's behavior and demeanor in

the body camera videos supported her knowing possession of drugs. She made various statements about her illnesses that were "lies," and the court believed her desire to get in her purse for her keys was an excuse. The same drugs were discovered in Holloman's house, her purse, and in A.H.'s autopsy. Thus, the trial court convicted her of all offenses charged. Holloman now appeals.

## II. ANALYSIS

Holloman argues that the evidence was insufficient to support her convictions. Though each conviction has different elements, each of Holloman's arguments are premised on her assertion that she did not know she had narcotics in her apartment when A.H. and R.H. were present in her apartment. Because we find that the evidence was sufficient to establish that she had knowledge of the presence of the narcotics, we affirm her convictions.

### A. *Standard of Review*

"Under settled law, 'we review factfinding with the highest degree of appellate deference.'" *Cappe v. Commonwealth*, 304 Va. 86, 87 (2025) (quoting *Bowman v. Commonwealth*, 290 Va. 492, 496 (2015)). In reviewing the sufficiency of the evidence, "[a]n appellate court does not 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alteration in original) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Atkins v. Commonwealth*, 85 Va. App. 542, 548 (2025) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). Under this standard, "we eschew the divide-and-conquer approach, which examines each incriminating fact in isolation, finds it singularly insufficient, and then concludes that the sum of these facts can never be sufficient. Instead, in an appellate sufficiency review, the

- 8 -

evidence is 'considered as a whole.'" *Barney*, 302 Va. at 97 (quoting *Stamper v. Commonwealth*, 220 Va. 260, 273 (1979)).

B. *Possession of a Controlled Substance*

Code § 18.2-250(A) makes it "unlawful for any person knowingly or intentionally to possess a controlled substance." To establish possession, the Commonwealth must prove "that the accused was aware of the presence and character of the drug and that the accused consciously possessed it." *Yerling v. Commonwealth*, 71 Va. App. 527, 532 (2020). This possession can be either actual or constructive. *Young v. Commonwealth*, 275 Va. 587, 591 (2008). "Constructive possession may be established when there are 'acts, statements, or conduct of the accused or other facts or circumstances which tend to show that the [accused] was aware of both the presence and character of the substance and that it was subject to his dominion and control.'" *Yerling*, 71 Va. App. at 532 (alteration in original) (quoting *Drew v. Commonwealth*, 230 Va. 471, 473 (1986)). The trial court may consider, among other things, proximity to drugs, and ownership or occupancy of the premises where the controlled substance is found. *Id.*

Here, the only issue is whether Holloman had knowledge of the presence of the controlled substance.[5] Though Holloman denies having any knowledge that there were drugs in her apartment, the factfinder, having the opportunity to observe Holloman's demeanor as she testified, is the judge of credibility. *Washington v. Commonwealth*, 75 Va. App. 606, 616 (2022) (noting that an appellate court gives deference to the factfinder's credibility determinations because the factfinder "has the unique opportunity to observe the demeanor of the witnesses as

---

[5] Holloman suggests on brief to this Court that the evidence did not establish that she had dominion and control over the controlled substance. Holloman did not make this argument below. Thus, the issue was not preserved in accordance with Rule 5A:18, and it is waived. *See* Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice."). We consider only whether the evidence established that she had knowledge of the presence of the controlled substance.

they testify" (quoting *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015))). The factfinder was free to disbelieve or reject her testimony that she was unaware of the controlled substance. *See id.* at 615-16 ("[T]he fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt.").

The evidence in the record supports the conclusion that Holloman was aware of the controlled substance in her apartment. The drugs were found in multiple places in Holloman's apartment, in which only she and her minor daughter lived, including in Holloman's bedroom. Holloman acknowledged that she did drugs socially, and she admitted using drugs in her apartment only "three or four days" before A.H. died. She also admitted that the same weekend A.H. died, she and her friends used narcotics in her room and on her bed, the same bed where the police discovered the narcotics and on which Hudson observed A.H. playing during the video call.

Furthermore, per the autopsy, A.H. had significant levels of narcotics in her blood, amounts that were within or above the therapeutic range for *adults*. From this, a factfinder could reject Holloman's claims that she used all the drugs on the weekend, and a factfinder could infer that a significant enough amount remained that Holloman was aware of the drugs in her apartment. *See Garrick v. Commonwealth*, 303 Va. 176, 186 (2024) (noting that "[a] factfinder is permitted to infer that '[items] . . . of significant value[ are] unlikely to be abandoned or carelessly left in an area'" (alterations in original) (quoting *Ervin v. Commonwealth*, 57 Va. App. 495, 517 (2011) (en banc))).

Additionally, Holloman's behavior that night supports an inference that Holloman was aware of the drugs in her apartment. She returned A.H. home, unconscious, in the middle of the night. It took only minutes for Hudson to realize something was wrong with A.H. Holloman's explanations for returning A.H. home were not consistent. Moreover, Holloman's behavior on

that night, as seen in the officers' body camera videos, could lead a reasonable factfinder to conclude that her "emotions were the result of concern for [her] own predicament." *Knight v. Commonwealth*, 41 Va. App. 617, 626 (2003). Viewing the evidence in totality, we conclude that the evidence was sufficient to establish that Holloman knew of the presence of the controlled substances in her apartment. Thus, we affirm her conviction for possession of a Schedule I or II controlled substance.

C. *Felony Child Abuse or Neglect*

Holloman argues that the evidence was insufficient to support her convictions for child abuse. Holloman was charged with abuse and neglect of A.H. under Code § 18.2-371.1(A), which provides,

> Any parent, guardian, or other person responsible for the care of a child under the age of 18 who by willful act or willful omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of such child is guilty of a Class 4 felony.

She was charged with abuse and neglect of R.H. under Code § 18.2-371.1(B)(1), which provides,

> Any parent, guardian, or other person responsible for the care of a child under the age of 18 whose willful act or omission in the care of such child was so gross, wanton, and culpable as to show a reckless disregard for human life is guilty of a Class 6 felony.

Under the statutes, willfulness "requires an awareness that the conduct would cause or permit serious injury." *White v. Commonwealth*, 68 Va. App. 111, 121 (2017) (quoting *Mangano v. Commonwealth*, 44 Va. App. 210, 216 (2004)).

Holloman argues that there was no evidence of any willful act or omission on her part to put either A.H. or R.H. at risk. She contends that she could not have known A.H. was overdosing and needed medical care because she did not know there were narcotics in her apartment. As to R.H., she argues that she was unaware of any danger in leaving R.H. alone in the apartment because she did not know there were narcotics there. Thus, whether Holloman

- 11 -

acted willfully turns on whether the evidence establishes that she was aware of the drugs in her apartment. Because we have already determined that the evidence was sufficient to establish that Holloman was aware of the presence of the narcotics in her apartment, we likewise find that the evidence was sufficient to establish that she acted willfully. Accordingly, the evidence was sufficient to sustain her convictions for child abuse or neglect of both A.H. and R.H.

D. *Felony Homicide*

Under Code § 18.2-33, the "killing of one accidentally, contrary to the intention of the parties, while in the prosecution of some felonious act" other than those specified by statute, is second-degree murder. The "res gestae rule" requires some connection between the felony and the death. *Flanders v. Commonwealth*, 298 Va. 345, 359 (2020). It provides that the felony murder rule "applies where the killing is so closely related to the felony in time, place, and causal connection as to make it a part of the same criminal enterprise." *Commonwealth v. Montague*, 260 Va. 697, 701 (2000) (quoting *Haskell v. Commonwealth*, 218 Va. 1033, 1044 (1978)). Whether all three exist is a fact specific question. *Flanders*, 298 Va. at 359.

Holloman's argument here is that the "res gestae" requirement is not met because the Commonwealth did not establish that A.H.'s death was caused by a felonious act committed by Holloman. Specifically, she contends that the Commonwealth did not establish that she knowingly and intentionally possessed a controlled substance and thus she was not in the commission of any felony.

We disagree. As noted above, the evidence was sufficient to permit a reasonable factfinder to conclude that Holloman was aware of the presence of the drugs in her apartment. Therefore, Holloman was in possession of a controlled substance, and it was the controlled substance in her possession that caused the death of A.H. Thus, the evidence is sufficient to sustain Holloman's conviction for felony homicide.

- 12 -

### III. CONCLUSION

Because the evidence was sufficient to establish that Holloman was aware of the presence of the narcotics in her apartment, we find that the evidence was sufficient to support each of Holloman's convictions. Accordingly, the trial court is affirmed.

*Affirmed.*